[No. 14466-9-I.   Division One.   August 7, 1985.]

THE STATE OF WASHINGTON, *Respondent,* v. ROBERT
EDWARD FRANKLIN, *Appellant.*

*Mark Muenster* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Anne Bremner, Deputy,* for respondent.

COLEMAN, J.—On October 7, 1983, Officer Mario Navarette was working as an off–duty security guard in the Seattle Greyhound bus station. At approximately 5 p.m., he was approached by a citizen he recognized from previous encounters at the bus station. The citizen asked Navarette if it was legal to carry a gun in public. Navarette replied that "it's not legal to display a gun in public if that is what you mean." The citizen then stated, "I saw a guy in the bathroom with a gun." Officer Navarette asked for a description of the man in the bathroom, and the citizen told him the suspect was a male, seated in the middle stall, wearing blue jeans, tennis shoes, and a dark jacket.

At that point, Navarette proceeded directly to the nearby rest room. Once inside, he noticed that the middle stall was occupied and that the occupant was wearing white tennis shoes and blue jeans. Navarette adjusted a door so that people could not enter the rest room and then waited for the other men in the rest room to leave. The room eventually cleared, and Navarette waited for Franklin to come out of the stall.

As Franklin came out, Navarette drew his revolver, held it at his side and said, "Freeze." Navarette, who was in police uniform, then asked Franklin if he had a gun. Franklin said yes, and Navarette told him to face the wall. Franklin then said, "But it is just a blank", and Officer Navarette proceeded to conduct a pat–down search of Franklin's person. During the patdown, Navarette said, "Where is it?", and Franklin said it (the gun) was in his rucksack. Since Navarette was alone in the room with Franklin, and since he had no means of calling for backup, he handcuffed Franklin for his own safety.

After Franklin was handcuffed, Navarette opened the main compartment of the rucksack and observed a pair of gloves, a pair of handcuffs, and some white masking tape. He again asked Franklin where the gun was, and Franklin replied, "It is in the front pocket." Navarette unzipped the rucksack pocket and found a black revolver which he thought might be a .22 caliber revolver.[1] At some point during the search of the rucksack, Navarette recalled a police bulletin concerning a crime committed with handcuffs.

No further search was conducted, and Navarette took Franklin to an office in the building. After advising Franklin of his *Miranda* rights, Navarette asked him about the items found in the rucksack. Franklin stated that the handcuffs were for his sexual preferences, and the tape was for his tennis shoes. He also stated that he had purchased the gun that day. Navarette then transported Franklin to the precinct office and contacted robbery detectives because:

> with the items he had in his possession and his dress, his demeanor, his attitude, which was somewhat evasive, I came to the conclusion that he possibly had been involved in a robbery, and it was possible that he was getting ready to get involved with another robbery with the items that he had.

---

[1]The gun, however, turned out to be a starter pistol, and Navarette testified that he realized the gun was a starter pistol prior to arresting Franklin.

Franklin was subsequently charged with first degree robbery and indecent liberties. Prior to trial, the defense moved to suppress evidence found in the rucksack and statements made by Franklin while he was in custody. The trial court denied the motion to suppress the physical evidence and suppressed only a small portion of Franklin's postarrest statements. Franklin appeals the suppression ruling and his subsequent conviction.

■ The first issue raised by Franklin involves the reasonableness of his initial detention in the rest room. Specifically, Franklin contends that the reliability of Navarette's informant was unknown, and therefore, the officer did not have the "well founded suspicion" of criminal activity necessary to justify a temporary detention. Under Washington law, the "well founded suspicion" necessary to justify an investigatory detention may be based on information supplied by an informant if: (1) the informant's tip possesses sufficient indicia of reliability; and (2) the tip contains enough objective facts to justify the detention. *State v. Sieler,* 95 Wn.2d 43, 47, 621 P.2d 1272 (1980). Franklin contends that the informant's tip in the present case was not reliable because the informant was anonymous and therefore of undetermined reliability, and because Officer Navarette only verified the innocuous details of the tip. We disagree.

■■ The anonymity of an informant does not necessarily make an investigatory stop improper, especially when the informant's information indicates that a violent crime may occur. *State v. Lesnick,* 84 Wn.2d 940, 944–45, 530 P.2d 243, *cert. denied,* 423 U.S. 891 (1975); *see Sieler,* at 50. As Professor LaFave points out:

> [S]toppings for investigation are not all of one kind and . . . in some instances the need for immediate action may be so great that substantial doubts about the reliability of the informant or his information cannot be permitted to stand in the way of prompt police action.

3 W. LaFave, *Search and Seizure* § 9.3, at 103 (1978). In this regard, courts have recognized the need for an imme-

diate investigatory stop when an anonymous informant of undetermined reliability states that he or she observed a suspect carrying or displaying a gun in a public place. *State v. Hasenbank,* 425 A.2d 1330 (Me. 1981) (telephone informant saw man on street with a gun in his left rear pocket); *Henighan v. United States,* 433 A.2d 1059 (D.C. 1981) (telephone informant said woman on street was carrying a gun and narcotics in her purse); *State v. Bolden,* 380 So. 2d 40 (La. 1980) (unidentified citizen informant walked up to officer and stated that man in nearby nightclub had a sawed–off shotgun in his pants); *State v. Jernigan,* 377 So. 2d 1222 (La. 1979) (telephone informant saw man armed with handgun sitting in bar); *State ex rel. H.B.,* 75 N.J. 243, 381 A.2d 759 (1977) (anonymous tip describing man in restaurant with a gun in his possession); *see also State v. Kuahuia,* 62 Hawaii 464, 616 P.2d 1374 (1980); *Moore v. United States,* 468 A.2d 1342 (D.C. 1983); *People v. Tratch,* 104 A.D.2d 503, 479 N.Y.S.2d 250 (1984).

Like the anonymous informants in the cases cited above, the unidentified citizen informant in the present case observed a person in public with a firearm and reported his observations almost contemporaneously with their occurrence. The informant specified the public location of the suspect and gave a description of the suspect's attire. In these unique and potentially dangerous circumstances, such a tip is sufficiently reliable to support an investigatory detention if the police immediately verify the accuracy of the description and location of the suspect. Immediate police verification of the tip's innocuous details supports reasonable inferences that the anonymous informant's information is based on eyewitness observation, and that the unverified portion of the tip may also be accurate. *State ex rel. H.B.,* 381 A.2d at 762–63; *Hasenbank,* at 1333. Given the potential danger to the public in this case, we think the informant's reliability was sufficiently established. for purposes of a temporary investigatory detention.

We also disagree with Franklin's contention that the informant's tip contained insufficient objective facts to jus-

tify the investigatory detention. The informant gave a specific description of the suspect and the suspect's public location. The informant also stated that he saw the suspect with a gun. The inference to be drawn from this latter statement is that the suspect was either brandishing or otherwise displaying a gun in public. This information gave rise to the "well founded suspicion" necessary to make an investigatory detention. Furthermore, the potential danger to the public posed by an armed individual calls for immediate action, and in such circumstances, the police may forgo lengthy and unnecessary questioning of an informant in favor of an immediate investigation.

Franklin next contends that the search of his rucksack was an impermissible extension of a limited protective pat-down search. The protective pat-down search is a well established right "accorded in order that the officer may protect himself and others from physical harm, and its scope is strictly limited to the purpose for which it is permitted." *State v. Hobart,* 94 Wn.2d 437, 441, 617 P.2d 429 (1980). However, while there is no question that officers confronted with circumstances similar to those encountered by Officer Navarette may conduct a pat-down search of the suspect, there is some judicial disagreement as to when an officer may pat down or search bags or containers belonging to the suspect.

In general, courts considering this issue appear to take one of three approaches. Some courts have disallowed searches of containers or bags when they are out of the control and/or reach of the suspect. *State v. Landry,* 393 So. 2d 713, 714 (La. 1981); *State v. Jenkins,* 62 Hawaii 660, 619 P.2d 108 (1980). On the other hand, some courts have allowed searches of bags or containers out of the suspect's reach and control because "at some point [the officers] would be compelled to return the [container or bag] to [the suspect] and thus place themselves in the danger they sought to avoid." *United States v. McClinnhan,* 660 F.2d 500, 504 (D.C. Cir. 1981); *United States v. Mason,* 450 A.2d 464, 467 (D.C. 1982); *People v. Belk,* 100 A.D.2d 908, 474

N.Y.S.2d 564, 565–66 (1984). A third approach allows searches of bags and containers only if they are within the detainee's "conceivable grasp." *State v. Ortiz,* ___ Hawaii ___, 683 P.2d 822, 828 (1984). The problem with adopting any of these approaches is that none of them will be suitable in all circumstances. Thus, we decline to specifically adopt or endorse any one of these alternatives. However, where circumstances are such that the officer not only suspects that the detainee/suspect has a weapon, but is actually told by the suspect that, in fact, there is a weapon concealed in his bag or container, then the *McClinnhan* rationale seems particularly appropriate because the officer *knows* that handing the container back to the suspect unexamined will expose him to some risk. Even if such suspect is handcuffed, as Franklin was, it is possible that the detention will produce no evidence of criminal activity, and the detainee/suspect will have to be released and allowed to regain access to his container and weapon.

Appellant argues, however, that the constitutionally preferable course of action would be to seize the rucksack and then attempt to obtain a search warrant for its inspection. In responding to this argument, we must first point out that judicial review of swift decisions made by officers in the field should not come down to splitting constitutional hairs over alternative courses of action.[2] Rather, the focus should always be on the reasonableness of the action actually taken. In any event, it appears to us that an outright warrantless seizure of the bag would, in these circumstances, constitute a greater intrusion than a limited search conducted strictly for the purpose of neutralizing a situa-

---

[2]As the United States Supreme Court stated in *Michigan v. Long,* 463 U.S. 1032, 1052, 77 L. Ed. 2d 1201, 1221–22, 103 S. Ct. 3469 (1983): "[A] *Terry* [*v. Ohio,* 392 U.S. 1 (1968)] investigation . . . involves a police investigation 'at close range,' . . . when the officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a 'quick decision as to how to protect himself and others from possible danger . . . .' In such circumstances, we have not required that officers adopt alternative means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter." (Footnote and citations omitted.)

416

tion posing potential danger to the officer. Thus, given the close quarters and other circumstances surrounding Navarette's investigation of Franklin, we hold that it was reasonable for Navarette to search Franklin's rucksack.

Finally, Franklin contends that Officer Navarette did not have probable cause to arrest him for any offense, and therefore all fruits of the arrest, including postarrest statements, in–custody identification, and the physical evidence seized pursuant to the arrest, must be suppressed. We agree.

■ In general, probable cause for a warrantless arrest exists where a man of reasonable caution would believe that a crime had been committed. *State v. Fricks,* 91 Wn.2d 391, 398, 588 P.2d 1328 (1979). However, a bare suspicion of criminal activity will not give an officer probable cause to arrest. *State v. Mannhalt,* 1 Wn. App. 598, 600, 462 P.2d 970 (1969). The testimony of Officer Navarette indicates that, at best, he only *suspected* that Franklin had committed or was about to commit a crime.[3] The following portions of Navarette's testimony clearly illustrate an absence of probable cause:

Q. When you had opened the rucksack and noticed the cuffs and so on, and the tape, gloves, did you have any—what did you think at that point when you saw that material?

A. When I saw the handcuffs, also when I saw the gun, I had remembered something in one of our bulletins of some type of crime being committed with the use of a pair of handcuffs, silver handcuffs, and it didn't quite connect right away with the specific crime, but I remembered something involving a crime against persons.

. . .

[3]The State's suggestion that Officer Navarette had probable cause to arrest Franklin for an offense involving a firearm is without merit. The "weapon" was a starter pistol, and the arresting officer testified that he realized it was a starter pistol prior to arresting Franklin. Since a "firearm" is defined as a weapon capable of emitting a projectile, and since a starter pistol normally cannot emit a projectile, the officer did not have probable cause to arrest Franklin for a weapons offense.

Q. The reason that you took Mr. Franklin to the station that you thought with these items he may be about to be committing a robbery?

A. I believed that there was something very suspicious about having those particular items, but I also remembered something about a pair of handcuffs being used in some type of crime recently. At that time it was recently.

Officer Navarette also testified as follows:

Q. What did you do as a result of your observation and information that you had at that point?

A. I called up police radio and had them send a car down, and I transported him to Precinct One and contacted the robbery detectives.

Q. Why did you do that?

A. Because with the items he had in his possession and his dress, his demeanor, his attitude, which was somewhat evasive, I came to the conclusion that he possibly had been involved in a robbery, and it is possible that he was getting ready to get involved with another robbery with the items that he had.

Q. Did you transport him to the police precinct?

A. Yes, I did.

Though the suppression hearing judge concluded that "The handcuffs triggered a recollection . . . of a robbery that had occurred with handcuffs, and that was [sufficient] for him to proceed further and place the Defendant under arrest . . ." the officer's suspicions were simply too vague to justify a warrantless probable cause arrest. The officer was unable to recall any specific crime or any of the details of the crime reported in the police bulletin. This is a classic example of general suspicion as opposed to probable cause.

Consequently, Franklin's postarrest statements, his in–custody identification, and all articles seized from him must be suppressed as fruits of an unlawful arrest. *State v. Swaite,* 33 Wn. App. 477, 483–86, 656 P.2d 520 (1982). However, given our holding that the detention and limited search was justified, the State may attempt during the retrial to prove defendant's guilt with all information obtained and all observations made prior to Franklin's

unlawful arrest. *Swaite,* at 484–85. This would include Officer Navarette's observations of Franklin in the bus station rest room; a description of the starter pistol, handcuffs and tape; and Franklin's responses to questions in the rest room.

Reversed and remanded for a new trial.

CORBETT, C.J., and GROSSE, J., concur.