537 A.2d 235

**David Anthony LEE and Stanley Lee Hall**

v.

**STATE of Maryland.**

**No. 14, Sept. Term, 1987.**

Court of Appeals of Maryland.

Feb. 16, 1988.

---

Nancy S. Forster, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Norman L. Smith, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY and BLACKWELL, JJ., and MARVIN H. SMITH and CHARLES E. ORTH, JR., Associate Judges of the Court of Appeals of Maryland (retired), Specially Assigned.

RODOWSKY, Judge.

This case involves a warrantless search and seizure precipitated by an anonymous tip. Twelve judges of the Court of Special Appeals, sitting *en banc* on reargument, evenly divided over the constitutionality of the search. *Lee and Hall v. State*, 69 Md.App. 302, 517 A.2d 774 (1986).

Petitioners, David Anthony Lee (Lee) and Stanley Lee Hall (Hall), were arrested on August 13, 1984, by Montgomery County police officers who contemporaneously seized a handgun and other evidence. Following an evidentiary hearing before Judge James S. McAuliffe, petitioners' pretrial motion to suppress was denied. Evidence which was the object of the motion was introduced at petitioners' joint trial. Each petitioner was found guilty by the jury of attempted second degree murder, robbery with a dangerous and deadly weapon and use of a handgun in a crime of

violence, all arising out of a holdup and shooting perpetrated around midnight on August 12–13. Each petitioner was also convicted of carrying a handgun when arrested shortly before 5:00 p.m. on the thirteenth.

The Court of Special Appeals affirmed on all issues, including, because of the equal division in the appellate court, the trial court's denial of the suppression motion. We issued certiorari on a petition which raises two issues in addition to the search and seizure point.

## I

Petitioners' first submission is that affirmance by an equally divided court denies them rights relating to appellate review. That issue is moot. It relates only to petitioners' search and seizure contentions which have been presented to this Court and are decided herein.

## II

The petition for certiorari also raised the following question:

Does the Maryland statute prohibiting the carrying of a handgun require knowledge of the presence of the handgun and if so, was the evidence sufficient to convict Petitioners of this charge?

(a) If the evidence relied on to prove that Petitioners were guilty of carrying a handgun is the actual robbery itself, then shouldn't the carrying conviction merge with the use of a handgun conviction?

We answer this question on both factual and legal grounds.

First, the Court of Special Appeals correctly pointed out that the proof of carrying a handgun related to the late afternoon of August 13 when each of the two petitioners separately held the same gym bag which contained a handgun. Therefore, no problem of merger is presented on these facts. Further, the intermediate appellate court reviewed the evidence, including that of Hall's participation in a robbery some seventeen hours earlier in which that same

handgun had been used, and concluded that there was sufficient evidence of Hall's knowledge, even if knowledge is an element of the governing statute. We agree with the court's factual analysis.

Moreover, the governing statute, Md.Code (1957, 1982 Repl.Vol.), Art. 27, § 36B(b) provides:

> Any person who shall wear, carry or transport any handgun, whether concealed or open, upon or about his person, and any person who shall wear, carry or *knowingly transport* any handgun, whether concealed or open, in any vehicle traveling upon the public roads ... shall be guilty of a misdemeanor; and it shall be a rebuttable presumption that the person is knowingly transporting the handgun.... (Emphasis added).

Hall contends that this statute requires knowledge to convict for either wearing or carrying a handgun.

The plain language of § 36B(b) creates strict liability for the wearing or carrying of a handgun about one's person.[1] The scienter requirement applies only to vehicular transportation of a handgun and was inserted "so that a person who shows that he was not aware that his vehicle was transporting a handgun will not incur penalties." *Shell v. State*, 307 Md. 46, 69, 512 A.2d 358, 369 (1986). This interpretation is strengthened by the fact that the legislative bill by which § 36B(b) was proposed provided for strict liability without any knowledge requirement as to wearing, carrying and transporting. The "knowledge" requirement for transporting was inserted by amendment. *See* Acts of 1972, ch. 13. The addition of a scienter requirement specifically for vehicular transport underscores the corresponding omission of that requirement for wearing and carrying handguns.

---

1. The phrase "about his person" was defined in *Corbin v. State*, 237 Md. 486, 491, 206 A.2d 809, 812 (1965) to mean that "the accused was carrying the weapon or that it was in such proximity to him as would make it available for his immediate use." *See Evans v. State*, 11 Md.App. 451, 459, 274 A.2d 653, 658, *cert. denied*, 262 Md. 746 (1971); *Shifflett v. State*, 3 Md.App. 550, 554, 240 A.2d 286, 288 (1968).

## III

We turn then to the search and seizure issue and the facts out of which it arises. The record at the suppression hearing is the exclusive source of the facts for our review. *See Trusty v. State*, 308 Md. 658, 670–72, 521 A.2d 749, 754–56 (1987). Three Montgomery County police officers testified at that hearing, Detective Donald Deaton (Deaton), of the Germantown Investigative Section, and Sergeant John Straughan (Straughan) and Officer Leland Baughman (Baughman) from the Silver Spring Special Assignment Team (SAT). SAT is a unit of plainclothed officers who use unmarked vehicles. Exhibits introduced at the hearing included the written reports of Straughan and Baughman.

Deaton reported for duty at 7:00 a.m. on the 13th and was advised that a robbery and shooting had occurred around midnight at Corner Beer and Wine at 364 East Diamond Avenue in Gaithersburg, that the owner, Roland Ray (Ray), had been wounded and was in Suburban Hospital and that the police were looking for two black males. Deaton was given two photo arrays to show to the victim. Deaton saw Ray at around 11:40 a.m. shortly after Ray's surgery. Ray was under medication, dozing, and was unable to make any identification. It was not until August 24th, when Ray's condition had improved, that Deaton obtained a height and weight description from Ray but it related to only one of the robbers.[2]

Sometime shortly before 3:40 p.m. on the 13th Detective Richard Stone (Stone) spoke on the telephone to an individual who had called into the Germantown District Station.

---

**2.** The foregoing is consistent with, and more fully explained in, the testimony at trial. Ray had been shot once in the right side below the rib cage. He remained conscious and telephoned the emergency number, 911. Officer Robert Disinger (Disinger), then on radio car patrol in Gaithersburg, was dispatched to the crime scene. Ray described the robbers to Disinger as two black males in their early twenties, one of whom was wearing a yellow tank top shirt. Both were armed with handguns, one of which was silver or nickel plated. That information was used in a "be on the lookout" alert broadcasted to police officers in the early morning of the 13th.

That individual's identity was and has remained unknown to the police. The caller gave Stone information about the robbery which led Stone to telephone the Silver Spring District where he spoke to Straughan at about 3:40 p.m. According to Straughan's report, prepared after the arrest of petitioners, Stone had been told by the informant

that two subjects had bragged that they had done a Robbery in Gaithersburg at the Corner Beer and Wine where a subject had been shot.

The unknown subject stated that the two responsible would be a[t] the tennis courts behind 1014 Quebec [Terrace] with a small blue bag that would have a handgun, possible 45 calb.

The following are descriptions of the subjects that were involved given by the unknown subject.

1. DAVID LEE

. . . .

6–0 150 lbs.
Lives at 1014 Quebec [Terrace]
Nickname Butter
Wearing blue sweat pants
White shirt, white Nike tennis
shoes.
#2 Subject.
N/M 5'–10'
Wearing blue sweat pants
White shirt
White tennis shoes.
NICKNAME Bucky.

Lee was known to Straughan from a prior arrest and is a black person. According to the informant, Lee and Bucky would be at the courts to buy drugs.

After receiving the above information Straughan called in the other SAT units working that day, briefed them, and proceeded to Quebec Terrace in a caravan of three unmarked cars, each containing two officers. Straughan trav-

eled with Baughman.  They arrived at approximately 4:15 p.m.

The tennis courts at 1014 Quebec Terrace are located behind six or seven buildings which face on the street. Access to the rear is through a driveway which leads to an outdoor parking lot, tennis courts and at least one basketball court.  One of the SAT cars parked at the far end of the line of buildings from the driveway.  Straughan and Baughman drove to the parking lot at the other end of the buildings and parked alongside Piney Branch Road.  The third SAT car remained somewhere between the other two cars, apparently on Quebec Terrace.  Only Straughan and Baughman could observe the recreational area but they stayed in contact by radio with the officers in the other two cars.  Quebec Terrace is an area where SAT units had responded previously to numerous calls for various crimes.

When Straughan and Baughman first observed the basketball court there were seven individuals shooting baskets and talking.  Straughan recognized one of them to be Lee. A second individual in the group matched the physical description which had been given by the informant for Bucky.  Both Lee and the second person, later identified to be Hall, were dressed exactly as the informant had described.

Straughan and Baughman parked 100 to 150 yards from the basketball court.  Straughan got out of the car, raised the hood and pretended to work on the engine while intermittently observing the group on the court.  Baughman remained in the front right seat of the car observing the group and operating the radio.  Because Lee and Hall were reportedly armed, Straughan's plan was "to take the subjects down hard," but he delayed because neither he nor Baughman initially saw the blue gym bag which the informant had said contained a handgun.

After several minutes Straughan relayed a radio message through the Emergency Operations Center (EOC) to Stone in Germantown advising him of the situation.  After several more minutes Technician Ann Lester of the EOC radioed to

advise that someone calling himself "Kevin" had telephoned saying "that the police should get over to the area at 1014 Quebec Terrace to the rear, that the people that they were looking for were there, that they were about ready to leave, and that the bag was on the split rail fence by the basketball court." Straughan advised the EOC technician that neither he nor Baughman saw the bag.

A "couple of" minutes later Technician Lester again radioed to the Straughan–Baughman unit to report that the caller was still on the phone and was saying that the police had "better do something because the individuals are getting ready to leave."

Thereafter, as Straughan was pretending to work on the car's engine, he looked up and saw Lee standing on the basketball court holding a blue gym bag. Baughman also saw Lee with the bag. During this period Straughan, but not Baughman, also observed Hall handle the bag for a few seconds. The order was given by radio to the other SAT units to move in on foot and they had started to do so when Lee took the bag and walked from the court into the building at 1014 Quebec Terrace. The SAT officers withdrew to their former positions.

A few minutes later Lee, carrying the bag, came out of the building, hung the bag by its handles on the split rail fence and rejoined the group on the basketball court. By this time that group had dwindled to five persons, including Hall and Lee. Again the signal was given to move in. The six SAT officers, at least two of whom were armed with shotguns, ran from three directions toward the basketball court shouting that they were police officers and that the persons on the court were to lie face down on the ground. When the officers reached the basketball court, the five young men were prone. While the other five officers patted down the five young men, Baughman went directly to the gym bag on the fence. Baughman felt the bag to be "rather heavy" and it "appeared to be weighted down." He opened the gym bag while he was "[p]robably a couple of feet away from" Lee. Inside was a white plastic bag which

contained a Charter Arms, .44 caliber, chrome plated revolver, the cylinder of which could hold five rounds and which then contained four live rounds.[3]

Baughman called out that he had the gun and Straughan "immediately" advised Lee and Hall that they were under arrest for carrying a concealed weapon. A third young man in the group was found possessing a controlled dangerous substance and was also arrested.[4] The other two young men were free to go.

When ruling on the suppression Judge McAuliffe analyzed the "hard take down" as an arrest. He held that the police, by having independently corroborated certain of the information furnished by the anonymous tipster, had probable cause to arrest Lee and Hall for the shooting and robbery earlier that day. The circuit court concluded that the search of the bag was incident to a valid, warrantless arrest.

Our analysis emphasizes that petitioners' argument for suppression of the gun rests on the federal exclusionary rule so that we are concerned only with a possible violation of the fourth amendment to the United States Constitution. Within that framework the initial seizures of petitioners' persons were constitutionally permissible because of reasonable suspicion. Then, when Officer Baughman hefted the gym bag prior to opening it, the police obtained probable cause so that opening the bag and formally arresting the petitioners did not offend the fourth amendment. We explain.

### A

There was a "seizure" of the petitioners' persons, within the meaning of the fourth amendment, when the

---

**3.** Ballistics evidence at trial was that the bullet removed from the shooting victim had been fired from the seized handgun.

**4.** There is no merit to petitioners' contention that this third individual was arrested simply because he generally matched the description of Hall given by the informant.

SAT teams left their surveillance positions and charged with weapons drawn while identifying themselves as police officers and ordering the five young men to lie prone on the basketball court. "These circumstances surely amount to a show of official authority such that 'a reasonable person would have believed that he was not free to leave.'" *Florida v. Royer*, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229, 239 (1983) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980) (opinion of Stewart, J.) (footnote omitted)).

B

Critical to any constitutional validity of the warrantless seizures of petitioners' persons is the reliability of the information from the informant. In the context of a search pursuant to a warrant *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), determined from the totality of the circumstances the reliability of an anonymous informant's information and, thus, probable cause underlying the warrant. The Court explicitly rejected any requirement that the "prongs" of the *Aguilar–Spinelli* formula, and the "spurs" of the veracity prong, be satisfied to validate the search in *Gates* which had been conducted under a warrant precipitated by a letter from an anonymous informant.[5] The Court set forth the following test in the context of that case:

The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. [*Illinois v. Gates, supra,* 462 U.S. at 238, 103 S.Ct. at 2332.]

---

**5.** *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). And *see Stanley v. State,* 19 Md.App. 507, 313 A.2d 847 (1974) (discussed in *Gates,* 462 U.S. at 229 n. 4, 103 S.Ct. at 2327 n. 4).

The petitioners' brief and oral argument, as well as those of the State, assume that *Gates* also applies to the evaluation of probable cause in searches and seizures without a warrant. We shall decide this case on the basis on which it was argued and accordingly accept, without so holding, that *Gates* applies to probable cause determinations in warrantless arrests.[6] Nevertheless, even under *Gates*, " 'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant in determining the value of [the informant's] report" and "should be understood ... as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause'...." 462 U.S. at 230, 103 S.Ct. at 2328.

In the instant matter the basis of knowledge claimed by the informant was that Lee and Hall had bragged that they had committed the crimes. Whether the caller directly heard this boasting is unclear from Sergeant Straughan's description of Detective Stone's conversation with the informant. Nevertheless, when Straughan arrived at the basketball court, Lee was there, a person meeting the description of "Bucky" was also there, and both were dressed as the informant had described they would be. The facts indicate that the informant had seen Lee and Hall relatively shortly before the informant's call to Stone. Then, as the police were observing the petitioners, the informant telephoned to or through the EOC, referred to himself as "Kevin" and insisted that the bag containing the gun was on a nearby fence. Straughan and Baughman knew of these telephone calls and of their content, even though the officers did not see the bag at that time. Moreover, the informant apparently knew the name and address of Lee, who was said to reside at Quebec Terrace, but knew only a nickname and general description for Hall. The fair inference is that the male informant resided in, or had access to,

---

6. The applicability of the *Gates* "totality of the circumstances" approach to warrantless searches is raised in *Malcolm v. State*, 70 Md.App. 426, 521 A.2d 796, *cert. granted*, 310 Md. 144, 527 A.2d 331 (1987).

premises which overlooked the basketball court. All of these facts support the reasonable probability that, if the information reported by the informant were true, he acquired his knowledge by having personally heard petitioners' boasting.

As in *Gates* the police did not know their informant's identity and he had no track record of having furnished reliable information on even one prior occasion. On the other hand, there was a good deal of specific information reported to the police which they were able to verify. In cataloging that information we are mindful that the proof of the content of the informant's conversation with Stone rests on Straughan's evidence of what Stone told Straughan the informant had said. The informant identified Lee by name, address, physical description and dress and identified Hall by nickname, physical description and dress.

As to the crimes, the informant correctly reported the name of the business where the robbery occurred, that a robbery victim was shot and that two, young, black males committed the crimes. Petitioners point out that by late afternoon on the day of the crimes media reports could have made this information general knowledge in Montgomery County. The record is silent on this point. Because the State had the burden at the suppression hearing to show that the seized evidence was admissible, it was incumbent on the State to present proof that the informer knew factual details about the crime beyond that which could be acquired by any person who for any reason whatsoever was interested in publicly reported facts. Nevertheless, because most people are generally not as conversant as was the informant with the details of crimes committed outside of their own neighborhoods, the reliability of the informant is enhanced by the correct information he possessed concerning the crimes.

Also relevant is whether the informant knows "a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." *Illinois v.*

*Gates, supra,* 462 U.S. at 245, 103 S.Ct. at 2335–36. For example, the informant in *Gates* predicted with substantial accuracy certain interstate travel by the suspects. In the instant case it seems to have been around 3:30 p.m. when the informant told Stone that Lee and Hall would be at the basketball and tennis courts behind Quebec Terrace at 4:30 p.m. When the police arrived at 4:15, the petitioners were already there. Because there is no independent evidence of when the petitioners arrived, the police could not know whether the informant's statement to Stone, although phrased in the future tense, was truly predictive. The informant also predicted a drug transaction, but there is no contention that the police observed any part of a drug sale. The informant did, however, associate Lee with Hall and state that they would have a blue gym bag and, when the police ultimately saw that bag, only Lee and Hall, from among a group of five or seven persons, placed their hands upon the bag.

Petitioners argue that the police observed only innocent conduct which should not dignify the anonymous tip to the level of probable cause. The State counters by reference to *Gates*'s rejection of a similar analysis applied by the Illinois Supreme Court in that case. There the United States Supreme Court said that "Lance Gates' flight to West Palm Beach, his brief, overnight stay in a motel, and apparent immediate return north to Chicago in the family car, conveniently awaiting him in West Palm Beach, is as suggestive of a prearranged drug run, as it is of an ordinary vacation trip." *Id.* at 243, 103 S.Ct. at 2335. In this instance, however, whether one considers petitioners' shooting baskets in light of the tip or independently of it, that conduct is not suggestive of attempted murder, armed robbery or carrying a concealed weapon.

While the Court in *Gates* also noted that "*[a]ll* of the corroborating detail established in *Draper* [*v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) ] was of entirely innocent activity...." *Draper* presented stronger circumstances of reliability than are presented here. *Illi-*

*nois v. Gates, supra,* 462 U.S. at 244 n. 13, 103 S.Ct. at 2335 n. 13. *Draper* involved the arrest of a drug courier based on information from a known informant "engaged as a 'special employee' of the Bureau of Narcotics at Denver for about six months" who "from time to time gave information" to a federal narcotics agent who "had always found the information given by [the informant] to be accurate and reliable." *Draper v. United States, supra,* 358 U.S. at 309, 79 S.Ct. at 331. Further, the informant in *Draper* correctly predicted that the courier would arrive in Denver by train from Chicago within the next day or two, the clothing the courier would be wearing and the bag the courier would be carrying. In the instant case we have neither a tested informer nor clear predictions which strongly indicate inside information.

■ Under the totality of the circumstances of the present case at the time the police ordered the petitioners to lie prone the police had a relatively high degree of reasonable and articulable suspicion that the petitioners were the robbers and were carrying a handgun in the gym bag. But, at that time, the suspicion did not reach a level of *"probability . . .* of criminal activity" sufficient for probable cause. *Illinois v. Gates, supra,* 462 U.S. at 235, 103 S.Ct. at 2330 (quoting *United States v. Spinelli,* 393 U.S. at 419, 89 S.Ct. at 590) (emphasis added).

### C

Before discussing whether the seizures preceding custodial arrest in this case were constitutionally permissible under a reasonable suspicion analysis, we digress to emphasize what this case does not present. No part of petitioners' argument for suppression of the gun and other evidence seized at the basketball court rests on state law. Petitioners did not cite Md.Code (1957, 1982 Repl.Vol.), Art. 27, § 36D and we intimate no opinion on its interpretation or

effect, if any, on facts similar to those before us.[7]

---

7.  Article 27, § 36D reads:
    (a) Any law-enforcement officer who, in the light of his observations, information, and experience, has a reasonable belief that (i) a person may be wearing, carrying, or transporting a handgun in violation of § 36B of this article, (ii) by virtue of his possession of a handgun, such person is or may be presently dangerous to the officer or to others, (iii) it is impracticable, under the circumstances, to obtain a search warrant; and (iv) it is necessary for the officer's protection or the protection of others to take swift measures to discover whether such person is, in fact, wearing, carrying, or transporting a handgun, such officer may
    (1) Approach the person and identify himself as a law-enforcement officer;
    (2) Request the person's name and address, and, if the person is in a vehicle, his license to operate the vehicle, and the vehicle's registration; and
    (3) Ask such questions and request such explanations as may be reasonably calculated to determine whether the person is, in fact, unlawfully wearing, carrying, or transporting a handgun in violation of § 36B; and, if the person does not give an explanation which dispels the reasonable belief which he had, he may
    (4) Conduct a search of the person, limited to a patting or frisking of the person's clothing in search of a handgun. The law-enforcement officer in acting under this section shall do so with due regard to all circumstances of the occasion, including but not limited to the age, appearance, physical condition, manner, and sex of the person approached.
    (b) In the event that the officer discovers the person to be wearing, carrying, or transporting a handgun, he may demand that the person produce evidence that he is entitled to so wear, carry, or transport the handgun pursuant to § 36B(c) of this article. If the person is unable to produce such evidence, the officer may then seize the handgun and arrest the person.
    (c) Nothing in this section shall be construed to limit the right of any law-enforcement officer to make any other type of search, seizure, and arrest which may be permitted by law, and the provisions hereof shall be in addition to and not in substitution of or limited by the provisions of § 594B of this article.
    (d) Any law-enforcement officer sued in a civil action for conducting a search or seizure pursuant to this section which is alleged to be unreasonable and unlawful shall, upon his request, be defended in said action and any appeals therefrom, by the attorney general.
    (e) Every law-enforcement officer who conducts a search or seizure pursuant to this section shall, within twenty-four hours after such search or seizure, file a written report with the law-enforcement agency by which he is employed describing the circumstances surrounding the search or seizure and the reasons therefor on a form prescribed by the Secretary of Public Safety and Correctional

Further, the time at which an arrest occurred under Maryland law does not control the federal constitutional analysis, despite language to the contrary in earlier cases. For example, in *Stanley v. State*, 230 Md. 188, 191, 186 A.2d 478, 480 (1962), we said:

The legality of the arrest and, therefore of the reasonableness of the search and seizure incident to the arrest, turns on the law of the State in which the arrest was made, absent a controlling federal statute. *United States v. Di Re*, 332 U.S. 581, 589 [68 S.Ct. 222, 226], 92 L.Ed. 210 [1948]; *Johnson v. United States*, 333 U.S. 10, 15–16 [68 S.Ct. 367, 369–70], 92 L.Ed. 436 [1948]; *United States v. Rabinowitz*, 339 U.S. 56, 60 [70 S.Ct. 430, 432], 94 L.Ed. 653 [1950]. The Supreme Court has said that if the arrest was unlawful nothing that happens thereafter can justify a search as its incident. *Rios v. United States*, 364 U.S. 253, 262–263 [80 S.Ct. 1431, 1436], 4 L.Ed.2d 1688 [1960].

*Stanley* was decided before *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

In *Terry* a police officer who reasonably suspected a robbery might be in the offing and that the three suspects might be armed for that activity "grabbed petitioner Terry, spun him around so that they were facing the other two, with Terry between [Officer] McFadden and the others, and patted down the outside of his clothing." *Id.* at 7, 88 S.Ct. at 1872. The Court "reject[ed] the notions that the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a 'technical arrest' or a 'fullblown search.'" *Id.* at 19, 88 S.Ct. at 1879. The Court also rejected the notion that there could not be a seizure without probable cause.

An arrest is a wholly different kind of intrusion upon individual freedom from a limited search for weapons,

---

Services. Such report shall include the name of the person searched. A copy of all such reports shall be sent to the Superintendent of the Maryland State Police.

and the interests each is designed to serve are likewise quite different. An arrest is the initial stage of a criminal prosecution. It is intended to vindicate society's interest in having its laws obeyed, and it is inevitably accompanied by future interference with the individual's freedom of movement, whether or not trial or conviction ultimately follows. The protective search for weapons, on the other hand, constitutes a brief, though far from inconsiderable, intrusion upon the sanctity of the person. It does not follow that because an officer may lawfully arrest a person only when he is apprised of facts sufficient to warrant a belief that the person has committed or is committing a crime, the officer is equally unjustified, absent that kind of evidence, in making any intrusions short of an arrest. [*Id.* at 26, 88 S.Ct. at 1882 (footnote omitted).]

■ Although the "seizure" in *Terry* was consistent with Ohio law, invalidity of a "seizure" under state law does not, in and of itself, produce a violation of the fourth amendment. In *United States ex rel. Griffin v. Vincent*, 359 F.Supp. 1072 (S.D.N.Y.1973), a New York prisoner sought federal habeas corpus based on a claimed illegal search and seizure. Manhattan police had stopped the cab in which Griffin was escaping from a murder and robbery in order to interrogate Griffin because the officers mistakenly, but reasonably, suspected that Griffin was leaving the scene of an automobile accident without having identified himself. The stop permitted certain observations which led to a frisk, discovery of a handgun, arrest and search of a bowling bag containing the robbery loot. A New York statute authorized the police to stop and frisk on suspicion of certain crimes but the statute did not refer to the misdemeanor of leaving the scene of an accident without identifying oneself and filing proper reports. The court, denying habeas corpus, concluded that even if the stop violated state law, "[t]he purported error under state law [did] not rise to constitutional levels." *Id.* at 1076.

" 'Just as a search authorized by state law may be an unreasonable one under [the fourth] amendment, so may a search not expressly authorized by state law be justified as a constitutionally reasonable one.' " *Sibron v. New York*, 392 U.S. 40, 61, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917, 934 (1968) (quoting *Cooper v. California*, 386 U.S. 58, 61, 87 S.Ct. 788, 790, 17 L.Ed.2d 730, 733 (1967)). Because this appeal is confined to a fourth amendment challenge, it is immaterial whether the initial seizure of the petitioners was legal or illegal under Maryland law, and, if illegal, what sanction or remedy, if any, under Maryland law might be available.

## D

In this part we consider whether the "hard take down," based on reasonable suspicion, was an unconstitutional seizure. The "test, which is grounded in the standard of reasonableness embodied in the Fourth Amendment, balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *United States v. Hensley*, 469 U.S. 221, 228, 105 S.Ct. 675, 680, 83 L.Ed.2d 604, 611 (1985). The determinative element in the balancing process here is that the police reasonably suspected that Lee and Hall were armed and dangerous.

On one side of the scales the nature of the subject intrusion was substantial. Petitioners were ordered to lie on the ground and weapons, including shotguns, were pointed at them.

On the other side of the scale is the governmental interest in effective crime detection and crime prevention. Petitioners not only were suspected of an earlier robbery and attempted murder but also of then carrying a concealed weapon. This is buttressed by the State's interest in protecting the safety of the officers and the other persons on the basketball court, toward whom no suspicion had been directed. Further, the intrusion, though substantial in degree, was brief in duration. No more than two minutes

elapsed from the time the officers moved in until petitioners were advised they were under arrest.

The police located both suspects at the place where the informant said they would be. The problem was that, to get close enough to the suspects to investigate, one or more police officers would have to have made an approach across a parking lot or tennis courts or both, or from around surrounding buildings, and go onto the outdoor basketball court. It is extremely unlikely that one or more strangers in that high crime area could saunter up to the basketball court and be considered by the suspects as potential recruits for a pick up game. Yet, if the petitioners became alarmed they might go for the pistol which was said to be in the bag a few feet from them. Consequently, Sergeant Straughan decided on a show of force to control the situation and minimize the risks. Under the circumstances that was reasonable.

In *United States v. Hensley, supra,* a police officer, acting on advice from another police department that Hensley was wanted for investigation of an aggravated robbery, used flashing lights to pull Hensley's car over to the curb and "approached Hensley's car with his service revolver drawn and pointed into the air." *Id.* at 224, 105 S.Ct. at 678. A unanimous Court considered that the teletype constituted articulable suspicion and concluded that

[w]hen the ... officers stopped Hensley, they were authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop. The ... officers' conduct was well within the permissible range in the context of suspects who are reported to be armed and dangerous. [*Id.* at 235, 105 S.Ct. at 683–84.]

Justice Brennan joined in the opinion but also wrote a brief concurring opinion pointing out that "the stop in this case—although it no doubt seriously infringed upon respondent's privacy—lasted a mere matter of moments ... before the discovery of the gun ripened what had been merely reason-

able suspicion into the full-scale probable cause necessary for an arrest." *Id.* at 236, 105 S.Ct. at 684.

*Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) is also relevant. A known informant advised a police officer on car patrol duty in a high crime area at about 2:15 a.m. that Williams, then seated in a parked car nearby, had a gun at his waist and was carrying narcotics. Although the officer did not draw his weapon, the search in *Williams* was more intrusive than involved here. When Williams did not open the door of his car as requested by the officer, but instead rolled the window down, the officer reached through the window and removed a handgun from the waistband of Williams's trousers even though "[t]he gun had not been visible to [the officer] from outside the car, but it was in precisely the place indicated by the informant." *Id.* at 145, 92 S.Ct. at 1923. The intrusion was justified by reasonable suspicion. "So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." *Id.* at 146, 92 S.Ct. at 1923 (footnote omitted).

The constitutionality of the detention for an unspecified length of time of the occupant of a house while the police searched it for drugs under a search warrant was presented in *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). In assessing the seizure to be justified, the Court said that

> both the law enforcement interest and the nature of the "articulable facts" supporting the detention are relevant. Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers. Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm

to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation. [*Id.* at 702, 101 S.Ct. at 2594 (footnote omitted).]

■ The fact that the SAT officers displayed shotguns while they charged toward the basketball court did not per se elevate the seizure here to one then requiring probable cause. In *United States v. Doffin,* 791 F.2d 118 (8th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 210, 93 L.Ed.2d 140 (1986), a police officer reasonably suspected that the occupants of an automobile which he had stopped were fleeing the scene of an armed bank robbery. The officer, who had a sheriff as a backup, pointed his shotgun at the driver, ordered the driver and the other two occupants to get out of the car and to lie face down on the road. The court held that this phase of the events was an investigative stop employing reasonable measures under the circumstances. *United States v. Merritt,* 695 F.2d 1263 (10th Cir.1982) involved a warrantless seizure in which twelve to fifteen policemen, two to three of whom carried shotguns, surrounded a truck containing three persons and ordered the occupants to go to the rear of the truck and to "freeze." The seizure was upheld because the police had reason to suspect, incorrectly as it developed, that an armed and dangerous murder fugitive was in the truck. Reasonable suspicion similarly justified a stop employing shotguns and spread eagle patdowns of suspects in *People v. Ulrich,* 83 Mich.App. 19, 268 N.W.2d 269 (1978).

An officer, with gun drawn, stopped two drug suspects who were walking from a motel office to their motel room in *United States v. Seni,* 662 F.2d 277 (4th Cir.1981), *cert. denied,* 455 U.S. 950, 102 S.Ct. 1453, 71 L.Ed. 664 (1982). The Court considered display of the weapon a reasonable precaution which did not invalidate the stop which was made without probable cause. *Washington v. Franklin,* 41 Wash.App. 409, 704 P.2d 666 (1985) presented an investigative stop in the men's room of a bus terminal. Someone had told a police officer who was moonlighting as a security

guard that a man with a gun was in the rest room. At a time when the suspect and the officer were the only persons in the room, the officer drew his revolver, ordered the suspect to "freeze," handcuffed him and searched his knapsack where the gun was found. It developed that the gun was a "starter pistol." The court held that the above phase of the seizure was constitutional.

Constitutional seizures based on reasonable suspicion are also illustrated by cases in which stops of vehicles have been made by officers with drawn guns who ordered the occupants out of the vehicle. These cases include *United States v. Greene,* 783 F.2d 1364 (9th Cir.), *cert. denied,* 476 U.S. 1185, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986); *United States v. Manbeck,* 744 F.2d 360 (4th Cir.1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985); *United States v. Perate,* 719 F.2d 706 (4th Cir.1983); and *United States v. White,* 648 F.2d 29 (D.C.Cir.), *cert. denied,* 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233 (1981).

The United States Court of Appeals for the Second Circuit in *United States v. Harley,* 682 F.2d 398 (2d Cir.1982), where backup officers had drawn their weapons to cover the approach to the suspect's car by another officer whose weapon was holstered, put the constitutional analysis as follows:

> In short, there is no hard and fast rule concerning the display of weapons. *Terry* stops are narrow but fluid exceptions to the warrant and probable cause requirements of the Fourth Amendment. What might be unreasonable when an officer merely suspects that a minor offense has been committed is not unreasonable when, as here, officers have reason to fear that a suspected criminal is armed. The nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, the reaction of the suspect to the approach of police are all facts which bear on the issue of reasonableness. [*Id.* at 402 (footnote omitted).]

Additionally ordering petitioners to lie on the basketball court did not convert the investigative stop into a seizure

requiring probable cause. *Terry* principles justified the seizure in *United States v. Taylor,* 716 F.2d 701 (9th Cir.1983) where drug enforcement agents at gun point stopped a truck which was driving away from a house for which the officers had a search warrant. The person occupying the passenger seat of the truck would not comply with requests to exit the truck until ordered to do so for the third time. That person was handcuffed, made to lie face down in a ditch and frisked.

*People v. Chestnut,* 51 N.Y.2d 14, 431 N.Y.S.2d 485, 409 N.E.2d 958, *cert. denied,* 449 U.S. 1018, 101 S.Ct. 582, 66 L.Ed.2d 479 (1980) concerned the N.Y.P.D. nighttime stop of a person whom they suspected had just received the handgun used in a street robbery a few minutes before. Sustaining the officers' using drawn guns and requiring the defendant to lie on the ground, the court said:

> It is true that defendant was ordered to lie on the ground, but it is simply inconceivable that the constitutional protection against arbitrary interference by police officers turns upon whether the detainee is positioned against a wall so that a frisk may be effectuated or ordered to lie on the ground. [*Id.* at 20–21, 431 N.Y.S.2d at 489, 409 N.E.2d at 961.]

And *see People v. Martin,* 121 Ill.App.3d 196, 76 Ill.Dec. 642, 459 N.E.2d 279 (1984); *State v. Nading,* 320 N.W.2d 82 (Minn.1982).

In the case before us, the nearest wall described in the testimony is the fence on which was hanging the bag with the suspected gun. Moreover, Straughan and Baughman had a relatively clear line of sight to Lee and Hall which means that Lee and Hall had a relatively clear field of fire at Straughan and Baughman. Lee and Hall had only a few feet to go to the bag while Straughan and Baughman had 100 or more yards to cover to get to Lee and Hall. By ordering all of the basketball players to the ground through a show of firearms, the police not only made it more difficult for Lee and Hall to reach for the bag but also put the three bystanders in that position which would be safest,

relatively speaking, if Lee or Hall began shooting. Further, the subject detention of approximately two minutes based on reasonable suspicion that the petitioners were armed and dangerous compares extremely favorably to the twenty minute detention based on reasonable suspicion of marijuana trafficking which was held constitutional under circumstances of investigative due diligence in *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

We hold that the very brief, though forceful, detention of the petitioners was constitutionally justified by reasonable suspicion under the circumstances.

### E

The next question is whether a protective search could constitutionally extend to the gym bag hanging on the fence at a distance estimated to be from a "couple" of feet up to eight feet, from where Lee was prone. Professor LaFave presents the issue in § 9.4(e) where he asks:

> Assuming circumstances in which an officer would be justified in frisking a person for a weapon, may he likewise examine the contents of items carried by that person, such as a purse, shopping bag, or briefcase? Most commentators have answered this question in the negative, reasoning that the officer can effectively protect himself from any risk arising from the fact that such an item might contain a weapon by simply putting it out of the person's reach during the period of the encounter. There is much to be said for this position, provided that it is recognized that there may exist circumstances in which the officer might "reasonably suspect the possibility of harm if he returns such objects unexamined" and that in such circumstances the officer must be allowed to "inspect the interior of the item before returning it." The prospects of an attack upon the officer after a detention has been terminated, as compared to *during* the detention, are somewhat limited, both from the standpoint of any motive to use force and any opportunity to do so.

This being the case, permitting a search of the purse or similar item under these special circumstances is a more limited grant of authority than if these objects were deemed subject to search whenever the possessor thereof is subject to a frisk.

The cases on the subject, however, have in the main not followed the view of the commentators. [LaFave, *Search and Seizure* § 9.4(e), 527–28 (1987) (footnotes omitted).]

In the case before us the divergency of views described above is immaterial. The more narrow approach advocated by the commentators implicitly permits the police to hold the bag. When that occurred in this case Officer Baughman felt that the bag was weighted down. At that point the police had probable cause for a custodial arrest.

Baughman's personal knowledge that the bag contained something heavy added significantly to the credibility of the anonymous tipster. A weighted down gym bag is inconsistent with its contents being a change of summer-weight clothes and a towel. At that point the likely reason why the unknown informant had been so insistent on there being a gun in the bag was that the informant in fact knew that there was a gun in the bag. It similarly became likely that the informant also had been correct in saying Lee and "Bucky" were the armed robbers of Corner Beer and Wine.

Although the police had probable cause to arrest when Baughman hefted the bag, Baughman first opened the bag, saw the gun and then told Straughan that the gun was there before the police made custodial arrests. These events occurred instantly, one after the other. Under these circumstances the fact that the search of the interior of the bag preceded the formal arrests does not prevent analyzing the search of the bag under principles governing searches incident to a valid arrest inasmuch as there was probable cause to support an arrest at the time of the search. In *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), the sequence of events was (1) an unconstitutional search of the purse of Rawlings's female

companion as to which Rawlings had no standing to object, (2) Rawlings's voluntary admission that illegal drugs found in the purse were his, (3) a warrantless search of Rawlings's person, and (4) the arrest of Rawlings. The Court held:

Petitioner also contends that the search of his person that uncovered the money and the knife was illegal. Like the Supreme Court of Kentucky, we have no difficulty upholding this search as incident to petitioner's formal arrest. Once petitioner admitted ownership of the sizable quantity of drugs found in Cox's purse, the police clearly had probable cause to place petitioner under arrest. Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa. [*Id.* at 110–11, 100 S.Ct. at 2564.]

Nor is a search incident analysis in the matter before us precluded by Officer Baughman's belief that his legal justification for opening the gym bag was a protective search for weapons. A search incident analysis applies because Baughman had probable cause to arrest at the time he opened the bag. *See Peters v. New York,* 392 U.S. 40, 66–67, 88 S.Ct. 1889, 1904–05, 20 L.Ed.2d 917, 936–37 (1968).

Petitioners, citing *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) and *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), submit that, even if the police had probable cause to arrest, the constitutionally required course of action was to obtain a warrant to search the contents of the container. The State submits that opening the gym bag was within the scope of a search incident to a valid arrest under the "area of control" doctrine of *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Petitioners counter by arguing the improbability that either of them successfully could have lunged for the bag while lying face down on the ground surrounded by armed police. Neither *Chadwick* nor *Sanders* "involved an arguably valid search incident to

a lawful custodial arrest." *New York v. Belton,* 453 U.S. 454, 461–62, 101 S.Ct. 2860, 2865, 69 L.Ed.2d 768, 776 (1981). Consequently, we examine the contention that the search of the bag was, as articulated in *Chimel,* beyond "the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Chimel, supra,* 395 U.S. at 763, 89 S.Ct. at 2040.

It is clear that the area of immediate control under *Chimel* is determined by the potentiality for harm and not by actual, physical control by the arrestee at the time the search is conducted. In *Foster v. State,* 297 Md. 191, 464 A.2d 986 (1983), the police searched inside of the partially opened drawer of a nightstand which was within two feet of the handcuffed arrestee. Judge Davidson, writing for this Court, concluded after a review of many cases cited therein that "even after an arrestee has been handcuffed there is a continuing potential for harm" so that "a search of an area from which possession of a weapon or destructible evidence might be gained is permissible." *Id.* at 219, 464 A.2d at 1001.

*New York v. Belton, supra,* is particularly instructive. After adopting a bright line test under which the entire passenger compartment of an automobile was to be viewed as an area into which an arrestee might reach, the Court further held:

It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach. . . . Such a container may, of course, be searched whether it is open or closed, since the justification for the search is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have. [453 U.S. at 460–61, 101 S.Ct. at 2864 (footnote and citations omitted).]

At the time the police officer in *Belton* searched the pocket of a jacket which was in the passenger compartment, the arrestees were standing on the highway at some unspecified distance from the vehicle where they had been separately positioned by the officer before he entered the car. Even if we assume that the bright line test of *Belton* relates exclusively to searches involving the contents of automobiles, *Belton* nevertheless demonstrates that *Chimel*'s concept of an area of control is quite flexible.

Two en banc cases decided on the same day by the United States Court of Appeals for the Fourth Circuit completely undermine petitioners' argument in this case. *United States v. Porter*, 738 F.2d 622 (4th Cir.), *cert. denied*, 469 U.S. 983, 105 S.Ct. 389, 83 L.Ed.2d 323 (1984) involved the arrest based on probable cause of a drug courier in an airport. The arrestee was taken to an office in the terminal used by the police where they searched her carryon bag. Porter contended the bag was then controlled by the police so that the search could not be incident to her arrest. A majority of the entire court read *Belton* to mean that so long as the carryon bag was within Porter's reach and the search was contemporaneous with the arrest, no other circumstances need to be litigated. Judge Murnaghan, joined by Chief Judge Winter, dissented over what he viewed as an unwarranted extension of *Belton* and as the erroneous elimination of any exigency requirement. Nevertheless, he recognized that, under other facts, a justifying exigency could be created by the possibility that weapons were present. *Id.* at 630.

The other en banc decision, *United States v. Litman*, 739 F.2d 137 (4th Cir.1984), concerned the arrest of a drug dealer when he entered a motel room. He dropped a shoulder bag and a shopping bag when arrested. After he had been frisked while his hands were against the wall, the police searched the two containers. The entire court agreed that there was a valid search incident. The majority relied on the *Porter* analysis while Judges Murnaghan and Winter found exigent circumstances because the encounter oc-

curred at a mutually selected site and because the "bags were first viewed and rendered available for search at the moment of meeting, which coincided with arrest." *Id.* at 139.

Subsequently, in *United States v. Silva,* 745 F.2d 840 (4th Cir.1984), *cert. denied,* 470 U.S. 1031, 105 S.Ct. 1404, 84 L.Ed.2d 791 (1985), a panel of the Fourth Circuit, applying *Belton, Litman* and *Porter,* upheld a search as incident to arrests for harboring an escaped murderer. The police, armed with shotguns, had burst into the arrestees' motel room, handcuffed them behind their backs, picked up a locked, zippered bag, took the key to the bag from the pocket of one of the arrestees and opened it.

█ The instant case is analogous to *Litman.* The seizure of petitioners and the search of the gym bag were contemporaneous with the custodial arrest. The bag was subject to petitioners' control when the seizure of their persons began and, however desperate or foolhardy it might have been for Lee or Hall to lunge for the bag while Baughman was holding it, it was physically possible for them to attempt to do so. In any event, the probable presence of a handgun created an exigency for the search.

The authorities relied upon by petitioners are factually distinguishable. In *United States v. Lyons,* 706 F.2d 321 (D.C.Cir.1983), the police searched in the pocket of a coat hanging in a closet while the arrestee sat handcuffed on a chair near the closet door. The court concluded a gun in that pocket was not "conceivably accessible to the arrestee[.]" *Id.* at 330. In *State v. Paahana,* 66 Haw. 499, 666 P.2d 592 (1983), the search took place in a separate, enclosed room several feet away from the arrestee.

### F

Following petitioners' custodial arrests their persons were searched more intensively than had been done in the initial frisk. This revealed other evidence, including a receipt for sports togs and other goods purchased with the

loot. Those searches were similarly valid as incident to the arrest. *See United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.

ELDRIDGE, Judge, concurring:

I agree with Judge Rodowsky that, when the SAT teams charged with weapons drawn, identified themselves as police officers, and ordered the five young men to lie prone on the basketball court, there was a "seizure" of the petitioners within the meaning of the Fourth Amendment. At that point, I believe that the police had probable cause to arrest the petitioners. Consequently, I would not address the issue of whether the police conduct could be justified under the *Terry* doctrine. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Judges COLE and BLACKWELL have authorized me to state that they concur with the views expressed herein.