RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0244p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

          *v.*                                          Nos. 08-4680/4682

CLINT WALKER,
                    *Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
Nos. 06-00003; 08-00073-001—Sandra S. Beckwith, District Judge.

Argued: August 4, 2010

Decided and Filed: August 12, 2010

Before: SILER and SUTTON, Circuit Judges; CLELAND, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Benjamin C. Glassman, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Kevin M. Schad, Richard W. Smith-Monahan, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Benjamin C. Glassman, Adam F. Seibel, ASSISTANT UNITED STATES ATTORNEYS, Cincinnati, Ohio, for Appellee.

_____

**OPINION**

_____

SUTTON, Circuit Judge. Clint Walker challenges his bank-robbery and brandishing-a-firearm convictions in two respects: (1) the district court erred in denying

_____

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

his motion to suppress evidence of the firearm obtained during a search of his duffel bag and (2) it erred in imposing two consecutive sentences under 18 U.S.C. § 924(c). We affirm.

I.

On December 5, 2005, Special Agent Michael Kelly of the FBI arrived at the scene of a bank robbery at the National City Bank in Sciotoville, Ohio. The bank's tellers told him that the thief had stolen $9,609 and gave a description of the perpetrator: a white male, between five foot eight and six feet and between 160 and 180 pounds, who wore dark clothing, gloves and a plastic or rubber skeleton mask with a hood, and who was armed with a semi-automatic silver pistol. Other witnesses identified the get-away vehicle as a blue Plymouth Voyager with wood-grain panels, and one witness provided a full license plate number. Local authorities put out a BOLO (Be On the Lookout) for the car and thief.

Among the officers in the area who received the BOLO was Officer Lee Bower of the Portsmouth Police Department, located about twenty minutes from the bank. Soon after receiving the bulletin, and twenty-seven minutes after the robbery, Officer Bower spotted a blue van with wood-panel siding parked outside of Pollock's Body Shop. He called dispatch to confirm the license plate number. It was a match. Officer Bower called for backup and drove into the body shop parking lot.

From his cruiser, Officer Bower watched Charles Burke cross the parking lot and head toward the van. The officer exited the car and approached Burke, then noticed Defendant Clint Walker, whom he knew as the owner of T & T Garage, walking toward him with a black duffel bag slung over his shoulder. Officer Bower asked Walker whether he was the one driving the van. He was. The officer asked him for identification. In response, Walker walked to the other side of the van. When Officer Bower followed and told him to stop, Walker explained, "Well, it's right here in my bag," and he unzipped the duffel bag part way. R.45 at 12. Officer Bower grabbed the bag, placed it on the ground and escorted Walker about eight feet away to the front of the police cruiser. The officer frisked Walker for weapons.

Backup arrived.  Bower told Officer Steven Timberlake to pat Burke down, which he did.  Burke provided Officer Timberlake with identification, but Walker renewed his insistence that his identification was in his wallet, which was in his bag.  The officers told him that they would retrieve the wallet from the bag, but Walker responded, "I'd rather not let you get in the bag" because "I have some personal things in there."  R.45 at 44.  Officer Timberlake placed the bag on the hood of one of the police cruisers and pulled the zipper open further.

With the bag unzipped further, both officers noticed a skeleton mask lying on top.  The officers handcuffed Walker and Burke and read them their *Miranda* rights.  "Where's the gun?" Officer Bower asked, and Walker told him it was in the bag.  R.45 at 36.  "Where's the money?" Officer Bower asked, and Walker looked away, declining to answer.  *Id.*  Based on the information gathered during this exchange and the information they already had, the police obtained a warrant to search the rest of Walker's bag, where (in addition to the mask) they found dark clothing, the money from the bank and a .22 caliber Jennings chrome firearm.

On January 4, 2006, a federal grand jury in the Southern District of Ohio indicted Walker for committing several crimes, including bank robbery and brandishing a weapon at the National City Bank and at several other Ohio banks.  Walker filed a motion to suppress the evidence found in the duffel bag, claiming that Officer Timberlake exceeded his authority under the Fourth Amendment when he unzipped the bag.  After a suppression hearing, the district court rejected the motion, ruling that the officers conducted a permissible *Terry* stop.  *See Terry v. Ohio*, 392 U.S. 1 (1968).

On April 19, 2007, a different grand jury in the Eastern District of Kentucky indicted Walker on separate charges of bank robbery and brandishing a firearm, after which the court transferred the case to the Southern District of Ohio.  On July 8, 2008, Walker signed a plea deal covering both indictments and pled guilty to two counts each of bank robbery and brandishing a firearm, but reserved the right to appeal the suppression ruling.  The guilty plea covered counts stemming from robberies at the US Bank in Ironton, Ohio, and the Peoples Bank in South Shore, Kentucky, in return for

which the government dropped the charges stemming from the National City Bank robbery.

Walker's presentence report gave a guidelines range of 425 to 435 months, including 41 to 51 months for the bank robbery charges, 84 months for the first brandishing charge (the mandatory minimum) and 300 months for the second brandishing charge (also the mandatory minimum). Neither party objected to the calculation, though the government moved under § 3553(e) for a downward departure to 318 months. The district court agreed that a downward departure was appropriate, and it sentenced Walker to 277 months and one day in prison and ordered him to pay $59,355.65 in restitution.

## II.

In addressing Walker's challenge to the district court's suppression ruling, the parties share some common ground. They agree that Officers Bower and Timberlake had "reason to believe that [they were] dealing with an armed and dangerous individual," *Terry*, 392 U.S. at 27, based on the BOLO and based on Walker's statements at the body shop parking lot linking him to the get-away vehicle, *see* Walker Br. 11; U.S. Br. 9. They agree that the two officers could take "necessary measures" to determine whether Walker had a weapon and to "neutralize the threat." *Terry*, 392 U.S. at 24; *see* Walker Br. 11; U.S. Br. 9. And they agree that the officers were entitled to make some form of limited search of Walker's duffel bag. *See* Walker Br. 11–12; U.S. Br. 10.

They part company over the scope of the search. While Walker concedes that the search was "justified at its inception," *Terry*, 392 U.S. at 20, he argues that, when the officers unzipped the duffel bag, they exceeded their authority because the search was no longer "reasonably related in scope" to its justification, *id*. What the officers should have done, he says, is perform a "frisk" of the outside of the bag to feel for weapons. Walker Br. at 11–12.

A search, however, is not unreasonable merely because officers did not use the "least intrusive" means. *City of Ontario v. Quon*, 130 S. Ct. 2619, 2632 (2010). Based

on the description of the robbery in the BOLO, including the warning that the thief was armed, Walker's statement that he was driving the car that matched the license plate of the robber's car and his response to the request for identification, the officers had a "perfectly reasonable apprehension" that Walker had a weapon in the duffel bag that he was carrying. *Terry*, 392 U.S. at 26. Understandably, the concern for officer safety extends not only to a suspect himself but to "the area surrounding a suspect" where he might "gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). Unzipping the bag more than it was already unzipped was "an efficient and expedient way" to determine whether a gun lay on the top of the bag, ready for use. *Quon*, 130 S. Ct. at 2623. After unzipping the bag and looking inside, the officers conducted no further search of the bag until they had a warrant. On this record, it is fair to say that the search was reasonably designed to discover weapons that might pose a threat to the officers' safety, namely weapons lying on the top of the already partially unzipped duffel bag. *See Terry*, 392 U.S. at 29. As in *Terry*, the sequence of events reflects the "tempered act" of a police officer who in the midst of an encounter with an armed suspected bank robber "took limited" and reasonable "steps" to protect himself and his fellow officer. *Id.* at 28. Outside the scope of the warrant requirement, the Fourth Amendment demands neither best practices nor formulaic adherence to one search method over another—just that the "searches and seizures" not be "unreasonable." U.S. Const. amend. IV. This modest search into the top of the bag was reasonable.

We have been down this road before. In *United States v. Williams*, 962 F.2d 1218, 1223–24 (6th Cir. 1992), the officer asked to look in a suspect's purse for weapons and even to "feel or squeeze" it, but she refused. *Id.* at 1222. The officer opened the purse and found cocaine, after which we upheld the search as a reasonable one. *Id.* at 1222–24. Walker says *Williams* differs from today's case because the defendant there did not suggest a lesser measure, a frisk of the outside of the purse. True enough, but that does not change the essential holding there or here—that the officers reasonably opened the bag under the circumstances. *See Terry*, 392 U.S. at 20; *see also Quon*, 130 S. Ct. at 2632.

The directive to steer clear of "unreasonable" searches cannot be reduced to a "frisk first" or any other one-size-fits-all command, which is presumably why courts of appeals have declined to adopt a "frisk first" requirement for *Terry* searches. *See, e.g.*, *United States v. Shranklen*, 315 F.3d 959, 963–64 (8th Cir. 2003); *United States v. Thomson*, 354 F.3d 1197, 1200–01 (10th Cir. 2003); *United States v. Rhind*, 289 F.3d 690, 693–94 (11th Cir. 2002); *United States v. Brown*, 133 F.3d 993, 998–99 (7th Cir. 1998). Other courts likewise have recognized that non-frisk search methods may be reasonable under the Fourth Amendment. *See, e.g.*, *United States v. Landry*, 903 F.2d 334, 337 (5th Cir. 1990) (grabbing a bag and looking inside); *People v. Jackson*, 590 N.E.2d 240, 241 (N.Y. 1992) (shining a flashlight through a plastic bag). The courts' job is to ask what was reasonable under the circumstances, not to poke and prod for lesser-included options that might not occur to even the most reasonable and seasoned officer in the immediacy of a dangerous encounter.

If it is a loaded gun that concerns the officer, moreover, it is by no means clear that poking and prodding the outside of a duffel bag is the most sensible way to find it. No doubt, the frisking of the outside of a bag intrudes less on the privacy of the suspect. But at what cost? Who looks for a gun by aimlessly grabbing and manipulating the outside of a large bag that may or may not contain the gun—and a loaded gun at that? That, we suspect, is not what gun-safety programs recommend. If *Terry* permits officers to open a closed container located in a car after a stop and after the officers have removed the passengers from the car, *see Long*, 463 U.S. at 1050–51, it surely permits an officer to unzip a duffel bag, one that is already partially unzipped, to see what is lying on top of it.

Walker claims that two cases say that officers making a protective *Terry* search must *always* frisk first. *See United States v. Vaughn*, 718 F.2d 332 (9th Cir. 1983); *McDowell v. State*, 965 A.2d 877 (Md. 2009). The argument has more sizzle than steak. *Vaughn* for one lays down no such categorical rule. The Ninth Circuit considered two searches of a briefcase, one of which was "thorough[]," 718 F.2d at 333, and determined that, under the circumstances, the decision to open the bag and search through it was not

reasonably related to the safety justification, *id.* at 335. The court did not, however, establish a categorical "frisk first" requirement; it merely applied *Terry* to the facts of an unexceptional case. *Cf. United States v. Flippin*, 924 F.2d 163 (9th Cir. 1991) (upholding a *Terry* search where officers opened a heavy make-up bag). In *McDowell*, the Maryland Court of Appeals acknowledged that a frisk is not required when it is "impracticable or is not likely to reveal the desired information." 965 A.2d at 885. That approach could well excuse the officers' actions here, as the search for a loaded weapon by prodding the outside of a duffel bag may well be "impracticable," and may well be quite dangerous, and prodding the outside of a bag may "not [be] likely to reveal the desired information" if the gun is wrapped in other items, *see Shranklen*, 315 F.3d at 963–64. At best, the decision might be construed as creating a presumption in favor of a frisk of containers, requiring the officer to give an "articulated reason why a pat-down [of the container] might not suffice." *McDowell*, 965 A.2d at 885. But that thumb-on-the-scales approach is difficult to square with the totality-of-circumstances reasonableness inquiries mandated by *Terry* and *Long*, to say nothing of *Quon*, a Supreme Court decision post-dating *McDowell* that says the proper scope of a *Terry*-like search turns not on best (or least-intrusive) practices but on whether the method chosen was reasonable.

Beyond the scope of the search, Walker raises one other issue in a letter brief. He argues that the officers did not have *any* reasonable concern for their safety once they had moved Walker eight feet away from the duffel bag, requiring them to obtain a warrant before looking into it. But Walker did not just forfeit this argument; he waived it. In his opening brief, he said that he "does not dispute that, as the district court found, the circumstances gave rise to reasonable suspicion that he may be armed and dangerous. . . . [T]he constitutionally proper course of action for the officers would have been to frisk, or feel, [his] bag for weapons prior to taking any further action." Walker Br. 11–12. This concession—that *some* search of the bag was justified—cannot co-exist with his new theory that "the officer's safety was not an issue . . . and a warrant was necessary to open the bag." Walker Ltr. Br. 1.

Even were that not the case, there is nothing to this argument.  Invoking *Arizona v. Gant*, 129 S. Ct. 1710 (2009), Walker claims that officer-safety concerns could not extend to the duffel bag, which was eight feet from Walker at the time of the search. *Gant*, however, dealt with a search incident to arrest, *id.* at 1714, and prohibited a search where there was no "possibility of access" by the suspect, *id.* at 1719.  There are at least two crucial differences between that case and this one.  One, Officers Bower and Timberlake by no means had the scene under control or their safety secure.  Not only did they not outnumber Walker and Burke, who were unrestrained and not yet in custody, but Burke also was standing just three feet from the bag at the time of the search.  *Cf. id.* (officers outnumbered the suspects, who were handcuffed and secured in separate patrol cars).  The possibility of access by one of the suspects was not remote.

Two, according to Walker's own telling, the officers did not have probable cause to arrest either suspect when the search was made.  If true, that left the officers with a difficult set of options.  They could make a limited search of the bag to ensure their own safety.  Or they could arrest the suspects and take them into custody, even though it might not yet have been clear that probable cause existed that they had robbed the bank. Or they could let the men go and return the un-searched bag to Walker.  Faced with these kinds of split-second judgments, police officers, it is clear, have a much more difficult job than we judges, who may take several weeks (if not months) to resolve these kinds of issues.  That is why we do not "require that police officers take unnecessary risks in the performance of their duties."  *Terry*, 392 U.S. at 23; *see also Long*, 463 U.S. at 1051–52.  Where, as here, the only alternative is to give a suspect access to a potential weapon (in an un-searched bag), a *Terry* search for weapons is justified—and reasonable.

III.

Walker also has filed a supplemental brief, arguing for the first time that his sentence should be vacated and remanded in light of *United States v. Almany*, 598 F.3d 238 (6th Cir. 2010).  Walker Supp. Br. 1.  *Almany* held that the mandatory minimums required by § 924(c) do not apply where a greater minimum sentence is provided for the

drug offense or crime of violence that serves as the predicate for the § 924(c) violation. *Id.* at 241–42.  It relied on the language of § 924(c), which says that the mandatory minimums apply "[e]xcept to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provisions of law." *Id.* at 241; 18 U.S.C. § 924(c)(1)(A).  The "except" clause, says Walker, applies to his two § 924(c) convictions.  That may or may not be the case, but Walker cannot clear a more prominent hurdle:  He did not raise the argument below and cannot satisfy plain error. *See Johnson v. United States*, 520 U.S. 461, 463 (1997); Fed. R. Crim. P. 52(b).

A party pressing a forfeited claim bears the burden of proving that the error affected his "substantial rights," namely that the error was prejudicial in a variety of respects. *See United States v. Olano*, 507 U.S. 725, 734 (1993).  Yet Walker cannot make a "specific showing of prejudice," and thus he is not entitled to resentencing. *Id.* at 735.  In fact, he has not even attempted to make a showing of prejudice, since his brief makes no reference to the proceedings below beyond the alleged error.  Walker cites a few cases in his discussion of the "substantial rights" prong, but none says anything about the effect of the alleged error in *this* case.  Walker also has not shown that he improperly received any *additional* time, which would be no easy task here.  The court sentenced Walker to just over 277 months in prison, below even the twenty-five year (300 month) minimum sentence that he now argues should apply.  Walker thus was sentenced *below* the greater of the two statutory minimums (300 months), which is a far cry from *Almany*, where the defendant was sentenced to an *aggregate* of the two statutory minimums.

Walker invokes *United States v. Gillis*, 592 F.3d 696 (6th Cir. 2009), which held that the government had not proved *harmless error* when the record did not clearly show that the same sentence would be imposed on remand. *Id.* at 699.  But the harmless error standard applied in *Gillis* differs from the plain error standard applicable here precisely because the burden of persuasion shifts, under the plain error standard, to the party raising the claim. *Olano*, 507 U.S. at 734–35.  We therefore reject Walker's claim for

resentencing because he has not shown that any error, even assuming for the sake of argument that one occurred, affected his substantial rights.

IV.

For these reasons, we affirm.