# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

        Respondent,

        v.

SHOMARI MASHINDA JACKSON,

        Appellant.

DIVISION ONE

No. 76974-0-I

UNPUBLISHED OPINION

FILED: June 10, 2019

DWYER, J. — Shomari Jackson appeals from the judgment entered on a jury's verdict finding him guilty of unlawful possession of a firearm in the first degree. On appeal, he contends that evidence of the firearm should have been suppressed and his statement disclaiming ownership thereof should have been admitted. These contentions lack merit. However, he properly challenges the trial court's imposition of a DNA (deoxyribonucleic acid) collection fee at sentencing. We affirm the conviction but remand this matter to the sentencing court regarding the DNA fee.

I

Just after 1:00 a.m. on December 5, 2016, Officer Jesse Thomas of the Seattle Police Department was on duty and in uniform. He observed Shomari Jackson riding a bicycle without a helmet or proper lighting. Jackson was riding along Dearborn Street in an area known to be a site of frequent vehicle prowls. Officer Thomas observed as Jackson, oddly wearing a backpack across his

chest, peered into several parked vehicles in a manner suggestive of prowling. Officer Thomas was aware that vehicle prowlers often carry tools to facilitate entry to vehicles and frequently wear backpacks across their chests to facilitate easy storage of tools and stolen items.

Officer Thomas, concerned both that Jackson was committing a traffic infraction and might be prowling vehicles, activated his vehicle's overhead lights, approached Jackson, and asked him to stop. When the officer did so, he observed Jackson trying to conceal the backpack and became further concerned that Jackson was manipulating an object inside the backpack.

After detaining Jackson, Officer Thomas informed him that he was being stopped for riding a bicycle without wearing a helmet. Officer Thomas did not mention his concern about vehicle prowling. Immediately, Jackson declared that he did not have any arrest warrants, that he had just purchased a bag of chips, and that he was returning to the homeless encampment on Airport Way where he was living. The officer knew this encampment to be a high crime area.

Jackson showed Officer Thomas an identification card from the Union Gospel Mission and gave his date of birth. The officer entered this information into a computer and discovered that Jackson had an extensive criminal history, including multiple felony convictions, and from an online police report learned that Jackson had recently been arrested after threatening a woman with a firearm. Officer Thomas was of the mistaken belief that the firearm Jackson was alleged to have possessed had not yet been recovered.

Another Seattle police officer, Joseph Belfiore, heard Thomas call for backup assistance over the police radio and arrived on the scene shortly thereafter. Officer Thomas's observations raised the suspicion that Jackson could be carrying a firearm in his backpack; thus, the officer decided that he would frisk Jackson for weapons before citing or releasing him. Officer Thomas informed Jackson that he wanted to frisk both Jackson and the backpack for weapons. He then directed Jackson to move to the front of his patrol car. Officer Thomas reached for the backpack, which Jackson was still holding. When Jackson attempted to retain the backpack, Officer Thomas took it from him and handed it to Officer Belfiore, who placed it on the ground.

Immediately before being patted down, Jackson admitted that he was carrying a Taser in his pocket. Officer Thomas removed the Taser but became concerned that Jackson might have a backup weapon on his person. A pat-down of Jackson's outer clothing led the officer to conclude that he did not.

However, Officers Thomas and Belfiore both formed the belief that the backpack was a possible safety risk. While Jackson had stated that the backpack contained a bag of chips, Officer Thomas thought that the weight of the backpack indicated that more than a bag of chips was inside. Although Officer Thomas had planned to return the backpack after citing Jackson, he and Officer Belfiore wished to check its contents for weapons. Officer Belfiore, now in possession of the backpack, believed that patting it down could risk discharging any firearm therein.

Thus, Officer Belfiore opened the front pocket of the backpack. Seeing nothing, he then opened the partially unzipped center pocket, shined his flashlight inside, and saw a .22 caliber revolver. Immediately, the officer said "firearm," prompting Jackson to state "That—that firearm is not mine." Officer Belfiore removed the revolver, noting that it was fully loaded with the hammer already cocked—meaning that only a short pull on the trigger was needed to fire the gun. This was the only item that Officer Belfiore found in the backpack.

Jackson was arrested for unlawful possession of a firearm. He did not present any testimony at the pretrial evidentiary hearing. Jackson's attorney, however, made several arguments for admitting Jackson's statement "That firearm is not mine." All were rejected by the trial court. In a police camera video of the incident, all audio was muted after Officer Belfiore said "firearm," and Jackson's statement was deemed excluded from the evidence at trial as inadmissible hearsay.

In a ruling on Jackson's motion to suppress the firearm, the trial court concluded that Officer Belfiore's visual inspection of the inside of the backpack was necessary, in view of the risk that Jackson might be armed, to neutralize the threat of harm to the officers and to the public. In doing so, the court rejected Jackson's argument that a bag must always be patted down before a visual inspection can be warranted. Instead, the judge concluded, officers have the authority to neutralize a threat in any manner reasonable under the totality of the circumstances. The circumstances identified by the trial court in its ruling were as follows:

4

First, the officer suspected the defendant of being in the parking lot for the purpose of car prowling.

Second, the defendant was wearing dark, baggy clothing, which was consistent with what a car prowler might be expected to wear.

Third, he was wearing a backpack on his front, unusual way to wear the backpack, which allowed it to be as what they described as a tactical vest to carry weapons and car prowl tools.

Fourth, the officers knew that car prowlers typically carry such weapons and tools to break in to cars.

Fifth, when Officer Thomas initially approached the defendant off camera, the officer testified that when he first approached the defendant, the defendant made furtive movements to place the backpack out of the officer's view.

The parking lot was in a high crime area.

The defendant said he was riding his bicycle back to his quarters at the nearby homeless encampment, which also was a high crime area.

The officer discovered that—during the database search that the defendant had a history of several felony convictions.

The defendant had been arrested only weeks earlier on allegations that he had threatened someone with a gun at the homeless encampment, which was where he was going at that moment, he said.

The defendant admitted that he had a Taser gun in his pocket, which suggested to the officers that the defendant likely also may have had a backup weapon on his person or in his backpack.

The backpack was heavy. That was inconsistent with the defendant's statement or implication that all he had in the pack was a bag of potato chips. It would have been imprudent for the officers not to investigate further to find out if that heavy object or objects was or were weapons. Although the defendant earlier had shown Officer Thomas a bag of chips in one of the compartments, that was by no means sufficient to dispel the officer's reasonable suspicion that were no—that there were weapons in the backpack. The backpack had several other compartments that could hold a weapon, including a large central compartment.

Under these circumstances, the court concluded:

I think it was reasonable for the officers [to] believe that merely patting down the backpack would not reveal a handgun or other weapon, especially if it were small. And I think it also was reasonable for the officers to be concerned that a vigorous pat

5

down of the backpack might place them and the defendant in serious danger because it could cause the gun to discharge.

Thus, the court ruled not that police would always be entitled to visually search any bag but, rather, that looking into Jackson's backpack was a reasonable action under the totality of the circumstances then prevailing.

At trial, Officers Belfiore and Thomas, as well as Detective Nathan Janes, testified. Defense counsel's attempts to question Officer Belfiore as to whether Jackson had admitted to knowing the firearm was in the backpack was met with a sustained objection, with the trial court reasoning that such questioning was intended to elicit introduction of Jackson's hearsay statement ("That firearm is not mine."). Detective Janes testified that a revolver with the hammer fully drawn is significantly easier to accidentally discharge than is a revolver with the hammer in a forward position.

Jackson testified, claiming that he had rushed from his tent at the encampment to purchase groceries for his wife, who had just suffered a miscarriage. In his haste, he asserted, he had grabbed the wrong backpack and was returning from the store with a bag of chips when he was stopped. He also claimed that he had not noticed the revolver inside.

The jury returned a verdict of guilty. At sentencing, the judge deemed Jackson eligible for a special drug offender sentencing alternative, pursuant to RCW 9.94A.660, and waived imposition of a standard range sentence. Jackson was sentenced to 44.75 months in prison, to be followed by 44.75 months of community custody. The court imposed a $100 DNA collection fee. Jackson now appeals.

II

Jackson first contends that the trial court erred by denying his motion to suppress evidence of the firearm as the product of an unlawful search. This is so, he avers, because Officers Thomas and Belfiore did not have the reasonable suspicion necessary to justify opening and visually searching inside the backpack. He further asserts that the police must pat down an item before a visual search of that item can be warranted. We disagree. The officers had a reasonable concern for their safety. There is no requirement that the officers always pat down a backpack as a predicate for ever being allowed to look into it.

Warrantless searches are per se unreasonable under the Fourth Amendment of the United States Constitution and article I, section 7 of the Washington constitution. The State bears the burden of showing that a warrantless search falls within an exception to the warrant requirement.[1] State v. Z.U.E., 183 Wn.2d 610, 617, 352 P.3d 796 (2015). One such exception is an investigative detention, or Terry stop, pursuant to which an officer may frisk a suspect for weapons if (1) the initial stop is lawful, (2) a reasonable safety concern exists to justify the frisk, and (3) the scope of the frisk is limited to protective purposes. Terry v. Ohio, 392 U.S. 1, 21-24, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); State v. Collins, 121 Wn.2d 168, 173, 847 P.2d 919 (1993). A

---

[1] In reviewing the denial of a motion to suppress, we determine whether the trial court's findings of fact are supported by substantial evidence. State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). Evidence is substantial when it is sufficient to persuade a fair-minded, rational person of the truth of the finding. Davis v. Microsoft Corp., 149 Wn.2d 521, 531, 70 P.3d 126 (2003). Conclusions of law from an order pertaining to the suppression of evidence are reviewed de novo. State v. Duncan, 146 Wn.2d 166, 171, 43 P.3d 513 (2002).

reasonable safety concern exists when an officer can point to "'specific and articulable facts'" that create an objectively reasonable belief that a suspect is "'armed and presently dangerous.'" Collins, 121 Wn.2d at 173 (quoting Terry, 392 U.S. at 21-24).

While a Terry search typically involves a pat-down of a suspect's outer clothing,

> [a] protective frisk may extend beyond a person to his or her area of immediate control "if there is reasonable suspicion that the suspect is dangerous and may gain access to a weapon." The same interests that justify a limited intrusion for a Terry stop allow an intrusion on a person's possessory interests in property in some circumstances. An officer is not restricted to frisking only a suspect's outer clothing, but may pat down articles of clothing not worn by, but closely connected to a suspect, where the officer reasonably believed a weapon was present therein.

State v. Laskowski, 88 Wn. App. 858, 861, 950 P.2d 950 (1997) (footnotes omitted) (quoting State v. McIntosh, 42 Wn. App. 579, 582, 712 P.2d 323 (1986)).

We have previously discussed when an officer may, in the context of a Terry stop, search items that are not worn by a suspect. See State v. Franklin, 41 Wn. App. 409, 414, 704 P.2d 666 (1985). In that case, an officer acting on a tip confronted Franklin, who he believed to be armed. Franklin, 41 Wn. App. at 411. After a pat-down search, Franklin told the officer that he had a gun in his rucksack. The officer handcuffed Franklin and searched the rucksack, finding a starter pistol inside. Franklin, 41 Wn. App. at 411.

On appeal, Franklin argued that the search of the rucksack was an impermissible extension of a limited protective pat-down search. Franklin, 41 Wn. App. at 414. In holding otherwise, we noted that

8

there is some judicial disagreement as to when an officer may pat down or search bags or containers belonging to the suspect.

In general, courts considering this issue appear to take one of three approaches. Some courts have disallowed searches of containers or bags when they are out of the control and/or reach of the suspect. State v. Landry, 393 So.2d 713, 714 (La. 1981); State v. Jenkins, 62 Hawaii 660, 619 P.2d 108 (1980). On the other hand, some courts have allowed searches of bags or containers out of the suspect's reach and control because "at some point [the officers] would be compelled to return the [container or bag] to [the suspect] and thus place themselves in the danger they sought to avoid." United States v. McClinnhan, 660 F.2d 500, 504 (D.C. Cir. 1981); United States v. Mason, 450 A.2d 464, 467 (D.C. 1982); People v. Belk, 100 A.D.2d 908, 474 N.Y.S.2d 564, 565-66 (1984). A third approach allows searches of bags and containers only if they are within the detainee's "conceivable grasp." State v. Ortiz, 683 P.2d 822, 828 (Hawaii 1984). The problem with adopting any of these approaches is that none of them will be suitable in all circumstances. Thus, we decline to specifically adopt or endorse any one of these alternatives. However, where circumstances are such that the officer not only suspects that the detainee/suspect has a weapon, but is actually told by the suspect that, in fact, there is a weapon concealed in his bag or container, then the McClinnhan rationale seems particularly appropriate because the officer *knows* that handing the container back to the suspect unexamined will expose him to some risk. Even if such suspect is handcuffed, as Franklin was, it is possible that the detention will produce no evidence of criminal activity, and the detainee/suspect will have to be released and allowed to regain access to his container and weapon.

Appellant argues, however, that the constitutionally preferable course of action would be to seize the rucksack and then attempt to obtain a search warrant for its inspection. In responding to this argument, we must first point out that judicial review of swift decisions made by officers in the field should not come down to splitting constitutional hairs over alternative courses of action. Rather, the focus should always be on the reasonableness of the action actually taken. In any event, it appears to us that an outright warrantless seizure of the bag would, in these circumstances, constitute a greater intrusion than a limited search conducted strictly for the purpose of neutralizing a situation posing potential danger to the officer. Thus, given the close quarters and other circumstances surrounding Navarette's investigation of Franklin, we

9

hold that it was reasonable for Navarette to search Franklin's rucksack.

Franklin, 41 Wn. App. at 414-16 (some alterations in original) (footnote omitted).

There is no bright-line rule, as Jackson avers, that requires police to pat down the outside of an item before visually searching within. No Washington case announces any required procedure regarding how an officer must go about searching a bag. Instead, we have held that officers may search an item that they reasonably believe may contain a weapon when a suspect requests that the item be placed in the suspect's possession. State v. Quaring, 32 Wn. App. 728, 731, 649 P.2d 173 (1982). With regard to pat-down searches for weapons, officer safety is the paramount concern, and the circumstances of each individual situation will dictate that which constitutes a lawful means of searching. Franklin, 41 Wn. App. at 415.

An opinion of the United States Court of Appeals for the Sixth Circuit summarizes the reasoning of various appellate courts on the subject. See United States v. Walker, 615 F.3d 728, 732-33 (6th Cir. 2010). In that case, a suspect was stopped on suspicion of bank robbery. The suspect attempted to reach into a duffel bag but was prevented from doing so by a police officer. Walker, 615 F.3d at 730. The police officer then looked into the bag and saw a ski mask similar to that which had been used in the robbery. The court rejected the suspect's argument that the officer should not have been permitted to look into the bag, reasoning that:

> The directive to steer clear of "unreasonable" searches cannot be reduced to a "frisk first" or any other one-size-fits-all command, which is presumably why courts of appeals have

10

declined to adopt a "frisk first" requirement for Terry searches. See, e.g., United States v. Shranklen, 315 F.3d 959, 963-64 (8th Cir. 2003); United States v. Thomson, 354 F.3d 1197, 1200-01 (10th Cir. 2003); United States v. Rhind, 289 F.3d 690, 693-94 (11th Cir. 2002); United States v. Brown, 133 F.3d 993, 998-99 (7th Cir. 1998). Other courts likewise have recognized that non-frisk search methods may be reasonable under the Fourth Amendment. See, e.g., United States v. Landry, 903 F.2d 334, 337 (5th Cir. 1990) (grabbing a bag and looking inside); People v. Jackson, 79 N.Y.2d 907, 581 N.Y.S.2d 655, 590 N.E.2d 240, 241 (1992) (shining a flashlight through a plastic bag). The courts' job is to ask what was reasonable under the circumstances, not to poke and prod for lesser-included options that might not occur to even the most reasonable and seasoned officer in the immediacy of a dangerous encounter.

If it is a loaded gun that concerns the officer, moreover, it is by no means clear that poking and prodding the outside of a duffel bag is the most sensible way to find it. No doubt, the frisking of the outside of a bag intrudes less on the privacy of the suspect. But at what cost? Who looks for a gun by aimlessly grabbing and manipulating the outside of a large bag that may or may not contain the gun—and a loaded gun at that? That, we suspect, is not what gun-safety programs recommend.

Walker, 615 F.3d at 732-33.

Nevertheless, citing to State v. Glossbrener, 146 Wn.2d 670, 49 P.3d 128 (2002), Jackson argues that any reasonable concern for their safety the officers once had to justify their search dissipated due to the passage of time in their interactions with him. In the case cited, a police officer conducted a traffic stop of Glossbrener's vehicle due to an inoperative headlight. The officer noticed Glossbrener reaching toward the passenger side of the vehicle for several seconds before bringing his vehicle to a stop. Glossbrener, 146 Wn.2d at 673. The officer asked Glossbrener why he had done this and, unsatisfied with his answer, asked Glossbrener if he would consent to performing a field sobriety test. Glossbrener, 146 Wn.2d at 673-74. Following Glossbrener's successful

completion of the test and a pat-down search of Glossbrener that revealed no weapon, the officer had Glossbrener wait in his car while the officer called for backup. Glossbrener, 146 Wn.2d at 674. When the backup officer arrived, the passenger side of Glossbrener's vehicle was searched. The officers found illegal drugs. Glossbrener, 146 Wn.2d at 674.

In deciding the case, the Supreme Court first reiterated the rule from Collins that a reasonable safety concern exists, and a protective search for weapons is justified, when an officer can point to specific and articulable facts which create an objectively reasonable belief that a suspect is armed and presently dangerous. Glossbrener, 146 Wn.2d at 680. The court then adopted two Court of Appeals holdings. First, that a "'Terry stop and frisk may extend into the car if there is a reasonable suspicion that the suspect is dangerous and may gain access to a weapon in the vehicle.'" Glossbrener, 146 Wn.2d at 680 (internal quotation marks omitted) (quoting State v. Terrazas, 71 Wn. App. 873, 879, 863 P.2d 75 (1993)). Second, that a "'protective search for weapons must be objectively reasonable, though based on the officer's subjective perception of events.'" Glossbrener, 146 Wn.2d at 681 (quoting State v. Larson, 88 Wn. App. 849, 853-54, 946 P.2d 1212 (1997)).

The Supreme Court held that the search of Glossbrener's vehicle was unlawful. Glossbrener, 146 Wn.2d at 684-85. While it acknowledged the officers' concerns for their safety stemming from Glossbrener's furtive movements and evasive answers when questioned, the court stressed that nothing during the course of the interaction with him furthered the officers' safety

12

concerns. Glossbrener, 146 Wn.2d at 682. Only after determining that Glossbrener was not intoxicated and had no weapons on his person, and after allowing him to sit alone in his vehicle while awaiting arrival of the backup officer, did the officers search the passenger side of his vehicle, finding the drugs. Glossbrener, 146 Wn.2d at 682. The objectively reasonable belief of danger, the court held, had dissipated by then. Glossbrener, 146 Wn.2d at 681-82.

Jackson's contention that the Glossbrener decision mandates reversal is unavailing. Although Jackson's and Glossbrener's seizures began with officers noticing furtive movements to conceal an object, Glossbrener gave the police no further cause for safety concerns. Jackson, however, gave them several.

The specific facts available to the officers at the time Jackson was searched, enumerated by the trial court, show that the officers were justified in undertaking the search. Officer Thomas saw Jackson behaving in a manner consistent with a vehicle prowler in a high crime area. When Officer Thomas initiated a detention to cite Jackson for a traffic infraction, Jackson made furtive movements to conceal the backpack that he was wearing across his chest.

When Officer Thomas checked Jackson's identification and ran his personal information through his computer, he learned that Jackson had a history of felony convictions and had been arrested for assault with a weapon not long before.[2] Jackson also stated that he was on his way to the same location where

---

[2] The trial court did not rely upon Officer Thomas's mistaken belief that the firearm involved in the previous offense had not been recovered, when it in fact had been, in evaluating the totality of the circumstances. Nor could it have. Under Washington law, officers may not reasonably rely on their own mistaken assessment of material facts. State v. Creed, 179 Wn. App. 534, 542-43, 319 P.3d 80 (2014). They may, however, rely on their subjective impression of facts that they correctly perceive. Glossbrener, 146 Wn.2d at 681.

he had committed this prior assault. A frisk of Jackson's outer clothing revealed a Taser, an indicator to the officers that he could have a backup weapon.

Jackson made an effort to retain possession of the backpack after the second officer arrived on the scene—Officer Thomas had to grab the backpack from him. Both officers held the backpack and noticed that the weight thereof was inconsistent with the weight of a bag of chips. From simply holding the backpack without feeling its surface, the officers could tell that its weight contained an unaccounted-for, possibly dangerous, item. Thus, unlike in Glossbrener, the passage of time and the events then occurring did not assuage the officers' safety concerns.

In addition, the circumstances demonstrate that the officers had a legitimate concern that in inspecting the backpack, a brisk pat-down search might be futile due to the backpack's multiple compartments, or dangerous, because of the possibility that a pat-down could cause a gun to accidentally discharge. As the situation bore out, this concern was well-founded. Officer Belfiore gave the following reason for looking inside the bag rather than feeling the exterior:

> In this case I elected to open the zippers just to do a visual look into the bag because if it's a firearm and I'm grabbing just the outside of the bag blindly, I don't want to take the risk of accidentally grabbing the trigger well area and squeezing the trigger and having a round go off and possibly striking myself, Mr. Jackson, or somebody else who's in the area.

Considering the totality of the circumstances, the officers were justified in conducting the search of the backpack. The trial court did not err by denying Jackson's motion to suppress.

14

III

Jackson next contends that the trial court erred when it refused to admit his statement disclaiming ownership of the seized firearm.

A trial court's decision to exclude evidence is reviewed for abuse of discretion. State v. Luvene, 127 Wn.2d 690, 706-07, 903 P.2d 960 (1995). An abuse of discretion is shown only when the reviewing court is satisfied that "'no reasonable judge would have reached the same conclusion.'" State v. Hopson, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989) (quoting Sofie v. Fibreboard Corp., 112 Wn.2d 636, 667, 771 P.2d 711 (1989)). If reasonable minds could disagree as to an evidentiary ruling, no abuse of discretion has been shown. State v. Willis, 151 Wn.2d 255, 264, 87 P.3d 1164 (2004).

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution grant criminal defendants the right to present testimony in one's own defense and the right to confront and cross-examine adverse witnesses. State v. Hudlow, 99 Wn.2d 1, 15-16, 659 P.2d 514 (1983) (citing Davis v. Alaska, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974)). However, these rights are not absolute, and "'[t]he accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.'" State v. Lizarraga, 191 Wn. App. 530, 553, 364 P.3d 810 (2015) (alteration in original) (quoting Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988)). The right to put on a defense is limited by the general rules of evidence, which include the hearsay rule.

15

On appeal, Jackson presents several arguments as to why his statement should have been admitted. None of these arguments withstand close scrutiny. We will address each in turn.

A

Jackson first attacks the trial court's stated ground for excluding his statement. The trial court declined to admit Jackson's statement on the basis that it was "self-serving hearsay." However, "there is no 'self-serving hearsay' bar that excludes an otherwise admissible statement." State v. Pavlik, 165 Wn. App. 645, 653, 268 P.3d 986 (2011). Instead, "'self-serving seems to be a shorthand way of saying that it was hearsay and did not fit into any of the recognized exceptions to the hearsay rule.'" Pavlik, 165 Wn. App. at 654 (internal quotation marks omitted) (quoting State v. King, 71 Wn.2d 573, 577, 429 P.2d 914 (1967)). Thus, to the extent that the trial court used this as a basis to exclude Jackson's remark, the court acted in error. However, because the trial court correctly concluded that the evidence was not admissible, no appellate relief is warranted. The statement was hearsay and Jackson presented the trial court with no proper reason to admit it.

B

At trial, Jackson asserted that the statement was admissible under two different exceptions to the hearsay rule: the excited utterance exception, ER 803(a)(2); and the state of mind exception, ER 803(a)(3). The trial court ruled that the statement was not admissible pursuant to either of these exceptions. Jackson now asserts that the statement should have been admitted under the

excited utterance exception. This is so, he asserts, because the statement was caused by the startling event of an officer finding a firearm in Jackson's backpack.[3]

An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803(a)(2). Our Supreme Court has recognized three closely connected requirements for analyzing an excited utterance: (1) a startling event or condition occurred, (2) the declarant made the statement while under the stress of excitement of the startling event or condition, and (3) the statement related to the startling event or condition. State v. Young, 160 Wn.2d 799, 806, 161 P.3d 967 (2007).

As to the excited utterance exception, the trial court determined that:

[T]he ground that the statement is admissible as an excited utterance does not resonate here with me. This was a routine traffic stop, there was no immediate aftermath of a startling event, there was no . . . no traumatic event that proceeded this. This was simply someone being stopped and somebody looking through a backpack.

Additionally, the statement by the police officer was not directed as a question, there was no need for an answer. A gratuitous statement in this situation by Mr. Jackson is, I think . . . not admissible in this situation.

The State avers that the video footage of the interaction shows no hint of surprise in Jackson's voice or mannerisms. Jackson, for his part, contends that

---

[3] Jackson does not challenge the trial court's ruling that the state of mind exception did not apply.

these findings are all based on the assumption that Jackson already knew about the firearm's existence, an assumption that the court was not entitled to make.[4, 5]

The ultimate holding—that the statement was not an excited utterance—was not an abuse of discretion. The trial court evaluated video footage of, and testimony about, the encounter and, based on Jackson's tone and mannerisms as well as the context of the encounter, determined that the evidence did not support employment of the excited utterance exception. The video of the encounter that the trial court had before it supports this; Jackson's voice does not exceed the volume or cadence of an individual engaged in ordinary conversation. No excitement is apparent. The trial court's determination was thus an eminently reasonable one.[6]

C

Jackson also makes several arguments for the first time on appeal as to why the statement should have been admitted. His principal argument is that, by not admitting the statement, the court disregarded ER 106. Alternatively, Jackson argues that the statement should have been admitted as falling within

---

[4] Jackson also contends that exclusion of his statement could have led the jury to believe he made an admission by silence that the firearm was his. The State did not, however, make any argument alluding to an admission by silence. Given that the footage only showed Officer Belfiore stating "firearm," and not questioning Jackson about the ownership thereof, it is improbable that a viewer of the footage would construe silence as an admission. Indeed, no one testified that Jackson was silent at the time. All testimony concerning his reaction was precluded.

[5] Jackson's statement itself supports the assertion that he knew of the firearm's existence. He denied ownership of the firearm, but not possession thereof.

[6] The trial court was thus justified in its decision, during the cross-examinations of Officer Belfiore, to disallow inquiry into whether Jackson admitted knowledge that his backpack contained a firearm. The court reasoned that this questioning would invariably lead to the introduction of Jackson's hearsay "not my firearm" statement, and was thus an end-run around the ruling excluding the statement. This was a tenable reason for refusing to allow this line of inquiry.

the res gestae exception to the hearsay rule. Both of these claims are without merit, as Jackson's counsel did not properly raise the issues at trial.

Pursuant to the applicable rule,

[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike is made, stating the specific ground of objection, if the specific ground was not apparent from the context.

ER 103(a)(1).

A noted scholar observes that, "[i]n general, the same principles apply to an alleged error in the *exclusion* of evidence. That is, an appellate court will not ordinarily consider the alleged error unless a timely and specific argument was made, on the record, that the evidence ought to be admitted." 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 103.18 (6th ed. 2016).

This observation is supported in the case law. "'Error in the exclusion of testimony by a trial court generally cannot be urged under a theory presented for the first time on appeal.'" Allen v. Asbestos Corp., 138 Wn. App. 564, 578, 157 P.3d 406 (2007) (quoting State v. Eaton, 30 Wn. App. 288, 293 n.7, 633 P.2d 921 (1981)); accord State v. Jordan, 39 Wn. App. 530, 539-40, 694 P.2d 47 (1985).

A party cannot change theories of admissibility on appeal. State v. Mak, 105 Wn.2d 692, 718-19, 718 P.2d 407 (1986), overruled on other grounds by State v. Hill, 123 Wn.2d 641, 870 P.2d 313 (1994); Jordan, 39 Wn. App. at 539-40; State v. Platz, 33 Wn. App. 345, 351, 655 P.2d 710 (1982).[7]

---

[7] In addition,

ER 106 allows a party to supplement portions of a writing or recorded statement offered by an adverse party with other relevant portions as fairness requires. It provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the party at that time to introduce any other part, or any other writing or recorded statement, which ought in fairness to be considered contemporaneously with it.

ER 106.

Jackson's counsel objected to the exclusion of the statement on the basis of "fairness," not on the basis of ER 106. On appeal, Jackson now avers that the essence of his "fairness" argument was that, if the court were to admit a video recording with audio of the officers and Jackson interacting, it was necessary to admit the complete video. Jackson contends that ER 106 was "plainly the argument being propounded." Br. of Appellant at 48. However, all evidentiary objections deal in some way with "fairness." Jackson's objection was not sufficiently specific to preserve his claim of error.

---

Pursuant to RAP 2.5(a)(3), to raise an error for the first time on appeal, the error must be "manifest" and truly of constitutional dimension. State v. WWJ Corp., 138 Wn.2d 595, 602, 980 P.2d 1257 (1999); State v. Scott, 110 Wn.2d 682, 688, 757 P.2d 492 (1988). The defendant must identify a constitutional error and show how the alleged error actually affected the defendant's rights at trial. It is this showing of actual prejudice that makes the error "manifest," allowing appellate review. [State v.] McFarland, 127 Wn.2d [322], 333[, 899 P.2d 1251 (1995)]; Scott, 110 Wn.2d at 688. If a court determines the claim raises a manifest constitutional error, it may still be subject to harmless error analysis. McFarland, 127 Wn.2d at 333; State v. Lynn, 67 Wn. App. 339, 345, 835 P.2d 251 (1992).

State v. Kirkman, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007).

Jackson does not allege a manifest error affecting a constitutional right. He was able to present his defense at trial; his statement to the police officers at the time of his arrest was duplicative of his testimony at trial. Thus, RAP 2.5(a) applies.

The absence of a specific objection herein is made worse by a simple fact. No extant case law in Washington provides that video evidence falls within ER 106's purview. Thus, the trial court would not be charged with understanding this as his theory. Moreover, Jackson's arguments about fairness were vague and woven into a broader argument about the need for the statement to be admitted under an exception to the hearsay rule—which the court plainly understood to be the essence of Jackson's proffer. Jackson's appellate incantation of ER 106 does not entitle him to relief.

Jackson also argues for admissibility of the statement under the rule of res gestae. Res gestae is not one of the exceptions to the hearsay rule enumerated in ER 803(a) but, rather, is a common law doctrine that predates the adoption of our rules of evidence. Young, 160 Wn.2d at 816. The res gestae doctrine "'recognizes that, under certain circumstances, a declaration may be of such spontaneous utterance that, metaphorically, it is an event speaking through the person, as distinguished from a person merely narrating the details of an event,'" and the utterance was instinctive rather than the result of premeditation or design. State v. Pugh, 167 Wn.2d 825, 837, 225 P.3d 892 (2009) (quoting Beck v. Dye, 200 Wash. 1, 10-11, 92 P.2d 1113 (1939)). Jackson did not raise this argument at trial, and he is not entitled to raise it for the first time on appeal. Allen, 138 Wn. App. at 578; Jordan, 39 Wn. App. at 539-40; Eaton, 30 Wn. App. at 293 n.7.

IV

Jackson, anticipating a holding that he may not raise his ER 106 or res gestae claims for the first time on appeal, alternatively claims that his trial attorney's omission of arguments on these grounds at trial amounted to ineffective assistance of counsel. This argument fails, as he does not show that his counsel's performance was deficient.

Counsel's representation is given a strong presumption of effectiveness that may only be overcome if a defendant demonstrates both deficient performance and prejudice. McFarland, 127 Wn.2d at 334-35. The competency of counsel is determined based upon the entire record at trial. McFarland, 127 Wn.2d at 335. If one of the two prongs of this test is not satisfied there is no need for further inquiry. State v. Lord, 117 Wn.2d 829, 883, 822 P.2d 177 (1991), abrogated on other grounds by State v. Schierman, 192 Wn.2d 577, 438 P.3d 1063 (2018).

"When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." State v. Kyllo, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). This presumption of sufficiency is rebutted by showing that "there is no conceivable legitimate tactic explaining counsel's performance." State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). Although "defense counsel has a duty to investigate all reasonable lines of defense," In re Pers. Restraint of Davis, 152 Wn.2d 647, 744, 101 P.3d 1 (2004), counsel is not required to pursue every possible strategy regardless of likelihood of success. McFarland, 127 Wn.2d at 334 n.2. We will not base a finding of deficient

performance on counsel's decision not to raise novel arguments. State v. Brown, 159 Wn. App. 366, 371, 245 P.3d 776 (2011).

Here, Jackson's attorney made a tactical decision to emphasize the excited utterance and state of mind exceptions, not ER 106 or res gestae, as grounds for admission of Jackson's statement. There is no case law indicating that a video falls within the purview of ER 106, let alone case law indicating that the rule of completeness mandates inclusion of a statement of which no part has been introduced. The decision not to raise a novel legal argument does not constitute deficient performance. Brown, 159 Wn. App. at 371.

Nor does a finding of deficient performance follow from the choice of Jackson's attorney not to raise res gestae as a ground for admission of his statement. Res gestae statements "'raise a reasonable presumption that they are the spontaneous utterances of thoughts created by or springing out of the transaction itself, and so soon thereafter as to exclude the presumption that they are the result of premeditation or design.'" Pugh, 167 Wn.2d at 838 (quoting Heg v. Mullen, 115 Wash. 252, 256, 197 P. 51 (1921)). It is recognized as the direct predecessor to the "excited utterance" exception as set forth in ER 803(a)(2). Pugh, 167 Wn.2d at 837. Choosing to argue for application of the excited utterance rule, as opposed to its less widely employed counterpart, was a reasonable tactical decision on the part of counsel. This is especially true given that the video evidence does not support the notion that Jackson's statement did not result from premeditation. Several minutes passed between his seizure and the discovery of the firearm. This passage of time gave Jackson ample

opportunity to consider what he would say if contraband was discovered by the officers. His voice and countenance do not indicate excitement stemming from an unanticipated occurrence.

Because we hold that no deficient performance by Jackson's counsel has been demonstrated, we need not reach the question of whether Jackson was prejudiced by his counsel's performance. Lord, 117 Wn.2d at 894.

V

Jackson's next argument is that he is entitled to a new trial due to cumulative error. Cumulative error is established when, taken alone, several trial court errors do not warrant reversal of a verdict but the combined effect of the errors denied the defendant a fair trial. State v. Hodges, 118 Wn. App. 668, 673-74, 77 P.3d 375 (2003). It is the defendant's burden to prove an accumulation of error of sufficient magnitude to necessitate retrial. In re Pers. Restraint of Lord, 123 Wn.2d 296, 332, 868 P.2d 835, 870 P.2d 964 (1994). Here, the only error shown was the trial court's reference to "self-serving hearsay" in ruling on the admissibility of his statement regarding the gun. As discussed above, this error was harmless, as the trial court correctly exercised its discretion in excluding the evidence for other reasons. Jackson demonstrates no other errors. Thus, there were no series of errors that could accumulate. His argument fails.

VI

In a supplemental brief, Jackson challenges the trial court's imposition of a $100 DNA collection fee. The fee should be stricken, Jackson avers, because as a result of prior convictions he has already undergone DNA testing. A legislative

amendment to RCW 43.43.7541, effective June 7, 2018, requires imposition of the fee "unless the state has previously collected the offender's DNA as a result of a prior conviction." Laws of 2018, ch. 269, § 18. Citing to State v. Ramirez, 191 Wn.2d 732, 426 P.3d 714 (2018), Jackson further notes that the amendment applies to defendants with appeals pending at the time of enactment. The State concedes the error and, having determined that Jackson's DNA was indeed previously collected, requests that we remand to strike the fee.

We remand this matter to the trial court for a ministerial order striking the $100 DNA fee.

Affirmed in part, reversed in part, and remanded.

_____, J.

We concur:

_____, J.          _____, A.C.J.